In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3392

RICHARD M. ARNOLD,

*Petitioner-Appellant,*

*v.*

MICHAEL A. DITTMANN, Warden,
Columbia Correctional Institution,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:15-cv-01524-NJ — **Nancy Joseph**, *Magistrate Judge.*

ARGUED APRIL 5, 2018 — DECIDED AUGUST 24, 2018

Before KANNE, ROVNER, and HAMILTON, *Circuit Judges*.

ROVNER, *Circuit Judge.* Richard M. Arnold appeals the district court's order dismissing as untimely his petition for a writ of habeas corpus. There is no dispute that Arnold's petition was filed beyond the one-year deadline established by 28 U.S.C. § 2244(d)(1), but Arnold alleges that his actual

innocence of the crime for which he was convicted—repeated sexual assault of a child—supports an equitable exception to the time limit and allows his late petition. *See McQuiggin v. Perkins*, 569 U.S. 383, 133 S. Ct. 1924 (2013). He relies on the recantation affidavit of the key prosecution witness against him—his son—as proof of his innocence. In view of the state court's finding that his son's recantation was cumulative of evidence that was put before the jury that convicted him, the district court concluded that Arnold could not meet the standard for actual innocence set forth in *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851 (1995). For the reasons that follow, we vacate the district court's judgment and remand for an evidentiary hearing on Arnold's claim of actual innocence.

## I.

In 2008, Arnold was convicted of repeated sexual assault of a child in violation of Wis. Stat. § 948.025(1)(b). The child in question was his son, M.A., who was the principal witness against Arnold at trial. M.A. testified that on some 15 to 20 occasions between May 2004 and August 2005, when M.A. was 13 to 14 years old, Arnold initiated and engaged in mutual masturbation with him. M.A. indicated that these sexual assaults took place during weekend visits to a rural cabin belonging to his grandfather (Arnold's step-father), at times when his grandfather was occupied outside in the yard or in one of the outbuildings on the property and M.A. and his father were in the cabin alone. (M.A. lived with his mother—who was not married to Arnold—but saw his father every other weekend at the cabin, where his father was living at the time.) On those occasions, M.A. testified, Arnold would summon his son into his (Arnold's) bedroom, where the two

would watch television and/or play video games for awhile, and eventually Arnold would initiate the sexual contact.

Arnold took the stand in his own defense and denied that he had ever touched his son in a sexual manner. Arnold testified that he did not spend any significant amount of time in his bedroom and further denied that there were times when he and his son were alone in the cabin.

Arnold and M.A. were the only two individuals with personal knowledge of what had transpired between them, and there was no forensic evidence supporting either party's account. So the case came down to a credibility contest between father and son. Both had substantial criminal histories: Arnold had five prior convictions, and M.A. (who was 17 years old at the time of trial) had a total of six prior convictions and/or juvenile adjudications of delinquency. The fact but not the nature of those convictions was disclosed to the jury.

M.A.'s grandfather, at whose cabin the alleged assaults took place, professed it was possible there were times during M.A.'s visits when Arnold and M.A. were alone in the cabin, as M.A. had testified. But he could not otherwise speak to M.A.'s allegations, beyond saying that M.A. had never indicated that anything bad was happening to him.

Other witnesses could only recount M.A.'s out-of-court statements about the alleged abuse. Detective Tom Makurat, who had interviewed M.A. in February 2006, shortly after M.A. had first discussed the abuse with a social services counselor, testified as to what M.A. had told him about the assaults. M.A.'s statements to Makurat were consistent with M.A.'s trial testimony. Makurat also testified that when he questioned

Arnold about his son's allegations, Arnold had denied them and insisted that he was never alone with his son in the cabin.

Two witnesses recounted prior alleged statements by M.A. that were inconsistent with his trial testimony. Lila Mae Behm, sister to M.A.'s paternal grandmother, testified that M.A. had told her that nothing had happened between his dad and himself. Philip Augsburger, who was "best friends" with Arnold. R. 31-3 at 508, testified that he had asked M.A. during a telephone conversation, "Did this happen between you and your father?" and "[h]e said no." R. 31-3 at 506. According to Augsburger, M.A. explained that he had been angry with his father when he made the charge.

M.A. in rebuttal testimony denied discussing the sexual assault allegations in any detail with either Behm or Augsburger and expressly denied making the inconsistent statements they attributed to him.

The defense also elicited testimony aimed at impeaching the credibility of M.A.'s account more generally. There was testimony, for example, that Arnold did not spend significant time inside of the cabin or in his bedroom and typically slept outside in a tent; that he was often away from the cabin working, hunting, fishing, or dating his then-girlfriend, Misty Frank, and frequently went out with friends during the evening (M.A. had testified that the assaults took place in the afternoon or evening hours); that the video games were in the living room of the cabin, where M.A. and his grandfather both slept, rather than in Arnold's bedroom; that M.A. would become angry with his father if he did not spend enough time with M.A. or agree to buy him something he wanted; and that,

contrary to M.A.'s testimony, there were unusual characteristics of Arnold's genital area, including a tattoo and multiple piercings of Arnold's penis and scrotum.

The jury convicted Arnold on July 17, 2008, at the conclusion of the four-day trial. Because Arnold had previously been convicted of a serious child sex offense (two counts of second degree sexual assault of a child), Arnold qualified as a "persistent repeater" under Wis. Stat. § 939.62(2m)(b)(2) & (2m)(c), and the trial court was required to sentence Arnold to a term of life in prison without the possibility of parole. The judge imposed that sentence immediately after the jury returned its verdict. Judgment was entered on August 12, 2008.

In October 2011, the Wisconsin Court of Appeals affirmed both the conviction and Arnold's initial request for post-conviction relief pursuant to Wis. Stat. § 974.02. *State v. Arnold*, No. 2010AP1532-CR, 2011 WL 5061617 (Wis. Ct. App. Oct. 26, 2011) (unpublished).[1] The Wisconsin Supreme Court subsequently denied Arnold's petition for review. *State v. Arnold*, 810 N.W.2d 221 (Wis. Jan. 24, 2012).

In November 2011, shortly after the Wisconsin Court of Appeals had affirmed Arnold's conviction along with the denial of his first request for post-conviction relief, M.A. signed

---

[1]  Wisconsin law provides for a unitary review process pursuant to which a defendant, following his conviction, first files a post-conviction motion for purposes of making any challenges to his conviction not already raised and resolved at trial. Once that motion has been disposed of, he may file a consolidated appeal of both his conviction and the ruling on his request for post-conviction relief. § 974.02; *see Page v. Frank*, 343 F.3d 901, 905–06 (7th Cir. 2003).

a notarized affidavit in the presence of two witnesses (apart
from the notary) in which he recanted the substance of his trial
testimony. At the time that M.A. reported the assaults by his
father, M.A. had been under the supervision of a juvenile court
and participating in a "Kids In Treatment" ("KIT") program,
based on adjudications that M.A. himself had sexually as-
saulted children. In his affidavit, which was directed to Ar-
nold's post-conviction counsel, M.A. represented that he had
falsely accused his father in order to placate KIT personnel and
ensure his successful completion of and discharge from the KIT
program:

> I [M.A.] would like to inform you that the charges
> against my father Richard Arnold are false. We did
> not have any kind of sexual contact. I am sorry for
> saying those things happened. I never meant for any
> of this to happen. But I felt pressured into saying
> those things because if I did not tell them something
> I would not have completed my KIT Program. So I
> told them that my dad did that so I could get them
> off my back and so I could get out of treatment and
> off probation and out of coun[se]ling. My dad[']s
> P.O. also pushed at me because my dad gave me
> condoms so if I had sex it would be safe sex. His
> P.O. put him in jail for that and said he was not a
> good father because he gave me the condoms. I just
> wanted everyone to leave me alone so I could get on
> with my life and so we could be a family again. But
> that didn't happen because after that my dad[']s
> P.O. wouldn't let us have any contact with each
> other. But I still continued to go there to see my dad

[ ] and grandpa. But most of the time my dad was with [M]isty and her son so I still did not get to spend time with my dad. I just want everyone to know that this was all a big mistake and it was not true. I made the mistake of lying about this and it cost all of us a[ ] lot. I hope that you can help get my dad out of prison so he can come home where he belongs. He has been locked up long enough for something that he didn't do.

I hope that by me coming forward with this now that it's not to[o] late for the truth to be told and to set my dad free.

Appellate Ct. R. 6 at 21–22.

In September 2013, nearly two years after M.A. signed the affidavit recanting the accusations against his father, Arnold filed a pro se motion in state court seeking a new trial on the basis of the affidavit. *See* Wis. Stat. § 974.06.[2]

The circuit court denied the motion without a hearing, R. 1-2 at 7, and the court of appeals affirmed. *State v. Arnold*, No. 2013AP2538, 2015 WL 540534 (Wis. Ct. App. Feb. 11, 2015) (unpublished). The appellate court noted that the trial court was not required to conduct a hearing on a motion for a new trial premised on newly discovered evidence if the motion itself was legally insufficient. *Id.*, at *1. In the view of the appeals court, Arnold's motion was insufficient in that M.A.'s affidavit did not constitute newly discovered evidence. Two

---

[2] The record before us is silent as to the reasons for Arnold's delay in filing the motion.

defense witnesses at Arnold's trial—Behm and Augsburger—
had recounted statements by M.A. to the effect that the sexual
assaults did not occur, and M.A.'s credibility had also been
impeached in other ways. *Id.* Consequently, "[e]vidence that
the victim fabricated his accusations was before the jury." *Id.*,
at *2.

> That Arnold's *Wis. Stat. § 974.06* motion offered the
> victim's recantation in the form of an affidavit does
> not change the substance of the recantation or
> present a new challenge to the victim's credibility.
> The jury had the opportunity to judge evidence that
> the victim recanted to other persons prior to trial
> and was otherwise less than credible. The victim's
> affidavit offered the same type of evidence that was
> before the jury. Therefore, the victim's affidavit was
> cumulative evidence and could not constitute newly
> discovered evidence. Because the record shows that
> Arnold was not entitled to relief on his
> *§ 974.06* motion, the circuit court did not err in
> denying the motion without a hearing.

*Id.*, at *2 (citations omitted). The Wisconsin Supreme Court
again denied review. 865 N.W.2d 502 (Wis. June 12, 2015).

Arnold then repaired to federal court seeking relief pursu-
ant to 28 U.S.C. § 2254. In his pro se habeas petition, Arnold
contended that the Wisconsin courts' handling of his request
for a new trial based on M.A.'s affidavit was inconsistent with
his rights under the Sixth and Fourteenth Amendments to the
Constitution, including his right to due process, and that his

actual innocence of the offense of which he was convicted independently entitled him to relief. R. 1, 2.[3]

On the State's motion, the district court dismissed Arnold's petition as untimely. R. 17. Pursuant to 28 U.S.C. § 2244(d)(1)(A), a petitioner must seek habeas relief within one year of the date his conviction becomes final. The court pointed out because Arnold did not file a petition for *certiorari* after the Wisconsin Court of Appeals affirmed his conviction in 2011 and the Wisconsin Supreme Court denied review in early 2012, Arnold's conviction became final on April 23, 2012 (once the 90-day period for seeking *certiorari* from the U.S. Supreme Court expired, *see Ray v. Clements*, 700 F.3d 993, 1003 (7th Cir. 2012)). Arnold thus had until April 24, 2013 to file his habeas petition. He did not actually file the petition until December 21, 2015, more than two and one-half years after the deadline. Arnold's second post-conviction motion, based on M.A.'s recantation affidavit, had no impact in this regard, as the motion was not filed until after the one-year deadline for seeking relief in habeas corpus had already passed. R. 17 at 3–4.

The district court considered whether Arnold's claim of actual innocence could excuse the running of the limitations

---

[3]  Arnold's petition also asserted that the state courts had misapplied, and/or abused their discretion in applying, certain Wisconsin statutory provisions and had deprived him of his rights to due process and equal protection under the Wisconsin constitution. But because a section 2254 petition is aimed at vindicating a petitioner's federal rights, errors of state law are not cognizable on habeas review. *See* § 2254(a); *see also*, *e.g.*, *Dellinger v. Bowen*, 301 F.3d 758, 764 (7th Cir. 2002).

period, but concluded it could not. The court noted that under *Schlup v. Delo*, *supra*, 513 U.S. at 327, 115 S. Ct. at 867, it was Arnold's burden to establish that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence" of his innocence. R. 17 at 4. Arnold's claim was founded on his son's recantation affidavit, but the Wisconsin Court of Appeals had said that the affidavit "offered the same type of evidence that was before the jury," which by virtue of witness testimony that M.A. had made pre-trial statements denying that his father had assaulted him, had necessarily been called upon to evaluate the consistency and credibility of M.A.'s account. R. 17 at 5 (quoting *Arnold*, 2015 WL 540534, at \*2). The state court, in other words, had already engaged in the type of analysis that *Schlup* mandated of the district court, and had concluded that M.A.'s recantation affidavit would not have affected the jury's verdict. R. 17 at 5. "Accordingly, because Arnold cannot prove that *no* reasonable juror would have convicted him, Arnold cannot satisfy the requirements for the actual innocence exception." R. 17 at 5 (emphasis in original). The court went on to deny Arnold's request for a certificate of appealability. R. 17 at 5–6.

Arnold filed a notice of appeal, accompanied with a renewed application for a certificate of appealability and a request that we appoint counsel to represent him. After an initial review of the district court's order and the record on appeal, this court found that Arnold had "made a substantial showing of the denial of his right to due process, given new evidence that the victim fabricated his testimony at trial." Appellate Ct. R. 8 (Kanne, J.). We therefore granted the request for a certificate of appealability and Arnold's request for

appointed counsel. The State subsequently moved to vacate
that order, arguing that whatever potentially meritorious
constitutional claim Arnold might have, the district court's
finding that Arnold's habeas petition was untimely resolved
the appeal. We rejected the State's motion, pointing out that
"the correctness of the court's assessment of timeliness is
implicated in the constitutional claim we identified, since the
district court held that Arnold had not provided 'new' evi-
dence demonstrating his innocence that would justify an
exception to the statute of limitations." Appellate Ct. R. 10.

## II.

There is no dispute that Arnold filed his habeas petition
beyond section 2244(d)(1)'s one-year time limit, so his petition
is barred as untimely unless he can establish that he qualifies
for an exception to the time limit. Arnold is relying on his
alleged actual innocence to overcome the time barrier. Actual
innocence is an equitable exception that renders the time limit
set forth in section 2244(d)(1) inapplicable. *McQuiggin v.
Perkins*, *supra*, 569 U.S. at 386, 133 S. Ct. at 1928; *see also Gladney
v. Pollard*, 799 F.3d 889, 895 (7th Cir. 2015). As it happens,
Arnold also wants to pursue a freestanding claim of actual
innocence in his petition, so the allegations of actual innocence
are doing "double duty" in this case both as a gateway to
belated habeas review and as a substantive basis for granting
the writ. *Perrone v. United States*, 889 F.3d 898, 903 (7th Cir.
2018).

*Schlup* establishes the framework for evaluating a claim of
actual innocence as a gateway to review of a habeas claim that
would otherwise be foreclosed by untimeliness or some other

type of procedural default. *See McQuiggin*, 569 U.S. at 386, 133 S. Ct. at 1928. A claim of actual innocence must be both credible and founded on new evidence. *Schlup*, 513 U.S. at 324, 115 S. Ct. at 865. To be credible, the claim must have the support of "reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Ibid*. That evidence must also be new in the sense that it was not before the trier of fact. *Ibid*.; *Gladney*, 799 F.3d at 896, 898. The petitioner's burden is to show that, in light of this new evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327, 115 S. Ct. at 867; *see also id*. at 329, 115 S. Ct. at 868. In evaluating the claim, the court is to conduct a comprehensive assessment that takes into account any reliable evidence probative of petitioner's innocence or guilt, even evidence that was previously excluded; the court is not bound by the rules of evidence that would govern at trial. *Id.* at 327–28, 115 S. Ct. at 867. It is not the court's role to determine independently what the petitioner likely did or did not do; rather, its task is to assess the likely impact of the new evidence on reasonable jurors. *Id.* at 329, 115 S. Ct. at 868. Although any delay or lack of diligence by the petitioner in pursuing his claim of actual innocence is not a bar to the claim, it is among the factors that the court may consider in assessing the merits of the claim. *McQuiggin*, 569 U.S. at 388–400, 133 S. Ct. at 1935–36.

Although a finding that Arnold has met the *Schlup* standard would open the door to habeas review notwithstanding section 2244(d)(1)'s time limit, it is by no means clear that his claim of actual innocence by itself would entitle him to a writ of habeas

corpus. In order to obtain habeas relief, a state prisoner must show that his conviction violates the Constitution, laws, or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S. Ct. 475, 480 (1991). To date, an assertion of actual innocence based on evidence post-dating a conviction has not been held to present a viable claim of constitutional error. *See Herrera v. Collins*, 506 U.S. 390, 400–02, 113 S. Ct. 853, 860–61 (1993). The Court in *Herrera* assumed without deciding that the Eighth Amendment precludes the execution of a person who has demonstrated his actual innocence. *Id.* at 417, 113 S. Ct. at 869; *see also id.* at 419, 113 S. Ct. at 870 (O'Connor, J., concurring); *id.* at 429, 113 S. Ct. at 875 (White, J., concurring in the judgment). But neither the Supreme Court nor this court has yet indicated that an actual innocence claim could, standing alone, support the issuance of a writ in a non-capital case. *See McQuiggin*, 569 U.S. at 392, 133 S. Ct. at 1931 ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); *Tabb v. Christianson*, 855 F.3d 757, 764 (7th Cir.), *cert. denied*, 138 S. Ct. 365 (2017) (describing issue as "open to debate" and collecting Supreme Court statements to that effect).[4] Indeed, we recently

---

[4] It is also unsettled what particular standard of proof a petitioner would have to meet in order to be entitled to relief on a freestanding claim of innocence. *See Herrera*, 506 U.S. at 417, 113 S. Ct. at 869 ("the threshold showing for such an assumed right would necessarily be extraordinarily high"); *House v. Bell*, 547 U.S. 518, 555, 126 S. Ct. 2064, 2087 (2006) ("The sequence of the Court's decisions in *Herrera* and *Schlup*—first leaving unresolved the status of freestanding claims and then establishing the gateway standard—implies at the least that *Herrera* requires more convincing proof of innocence than *Schlup*."); *Tabb*, 855 F.3d at 764.

characterized as "doubtful" the notion that such a claim could support relief on collateral review of a conviction. *Perrone*, 889 F.3d at 903.[5]

But before we could even take up this question, Arnold would have to pass through the innocence gateway by making the showing that *Schlup* requires. Unless he can overcome the time bar on his habeas petition in that manner, there would be no need and no authority for us to entertain his habeas petition, whatever substantive claims for relief it might raise.

Both parties, ultimately, recognize the important role that an evidentiary hearing will play in assessing Arnold's claim. Arnold's central point on appeal is that the veracity of M.A.'s affidavit has yet to be reviewed by any court, state or federal, and that he is entitled to a hearing for that very purpose. For its part, the State contends in the first instance that M.A.'s recantation, even if it could meet the *Schlup* standard, could not possibly meet the standard for granting relief on a freestanding claim of actual innocence, whatever that standard might be, *see* n.4 *supra*, when the recantation is considered along with all of the evidence supporting Arnold's conviction. But the State concedes that if we are not convinced by that argument, we should remand for an evidentiary hearing before the district court. As we now explain, we agree with the parties that the appropriate step for us to take at this juncture is to remand for such a hearing.

---

[5]  *Perrone* dealt with a challenge per 28 U.S.C. § 2255 to a federal statutory sentencing enhancement.

Arnold has presented a plausible claim of actual innocence. It is founded on M.A.'s formal recantation of his trial testimony, which necessarily amounts to new evidence in the sense that the recantation was not before the jury that convicted him. (More on that in a moment.) And M.A. himself has documented his recantation in an affidavit he swore to and signed in the presence of a notary and two other witnesses. Given that the State's case against Arnold rested primarily, if not exclusively, on M.A.'s testimony, his recantation as the accusing witness necessarily presents the possibility that Arnold could be factually innocent of assaulting his son.

We reject the State's suggestion that M.A.'s recantation *could not* meet the standard for relief on a freestanding claim of actual innocence, however credible a factfinder might determine it to be, such that it would be futile to proceed further. The State presumes (not unreasonably) that the standard for granting habeas relief on such a claim would be even more demanding than the standard *Schlup* has established for innocence as a gateway to habeas review. *See* n.4 *supra*. But the State has not ventured a guess as to what incremental increase in the burden of proof relief on a freestanding claim of actual innocence might require beyond *Schlup*'s already demanding standard (*Schlup* plus … what?). In that sense, the State's futility argument is really directed as much to the gateway function of Arnold's innocence claim as it is to the habeas-relief function of the claim (assuming there is one).

No doubt the *Schlup* standard is an onerous one for the petitioner to meet: the Supreme Court has indicated that it will be the rare case that can successfully navigate through the innocence gateway. *See McQuiggin*, 569 U.S. at 386, 133 S. Ct. at

1928 ("[w]e caution … that tenable actual-innocence gateway pleas are rare"), citing *Schlup*, 513 U.S. at 329, 115 S. Ct. at 868; *House v. Bell*, 547 U.S. 518, 538, 126 S. Ct. 2064, 2077 (2006) ("the *Schlup* standard is demanding and permits review only in the extraordinary case") (cleaned up); *see also Blackmon v. Williams*, 823 F.3d 1088, 1099 (7th Cir. 2016); *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005). Toward that end, *Schlup* emphasizes that the evidence of a petitioner's innocence must be reliable. 513 U.S. at 324, 115 S. Ct. at 865.

Arnold's claim of innocence is not founded on DNA or other scientific evidence that can be characterized as objective. (Then again, neither was his conviction.) It is, instead, based on the accusing witness's post-conviction representation that his prior testimony was false, notwithstanding the oath he took at trial to testify truthfully. Certainly there are reasons to treat recantations generally with a healthy dose of skepticism. *See Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000); *Dobbert v. Wainwright*, 468 U.S. 1231, 1233, 105 S. Ct. 34, 36 (1984) (Brennan, J., dissenting from denial of *certiorari*) ("Recantation testimony is properly viewed with great suspicion."); *Davis v. Bradshaw*, 2018 WL 3913103, at *1 (6th Cir. Aug. 16, 2018) ("A recantation is not always a good reason for a new trial. The recanting witness, in fact, may have told the truth the first time. …"). M.A. himself told the jury that he loved his father and simply wanted him to get the help he needed. R. 31-2 at 218–19. It is entirely possible that M.A.'s recantation is the product of guilt and/or pressure from family members rather than a belated confession of what is true. *Mendiola*, 224 F.3d at 593. Indeed, a clinical psychologist who testified for the State at Arnold's trial opined that recantations by juvenile victims of

familial sexual abuse are more likely to be explained by "very strong statements from people about the damage that they [the accusers] are doing to a person, the damage that they are doing to the family, from friends who are saying, you're weird if you go ahead with this, et cetera." R. 31-2 at 340–41.[6] These and other considerations might lead a court, after the recantation is fully aired in an adversarial hearing, to conclude that it is insufficiently reliable to satisfy the *Schlup* standard. *See, e.g., Jones v. Taylor*, 763 F.3d 1242, 1249–51 (9th Cir. 2014) (concluding after evidentiary hearing at which recanting witnesses, including victim, testified that recantations were insufficient to meet *Schlup* standard, let alone extraordinarily high standard for relief on freestanding claim of actual innocence); *Doe v. Menefee*, 391 F.3d 147, 165–73 (2d Cir. 2004) (Sotomayor, J.) (2-1 opinion) (concluding after evidentiary hearing that recantation of victim and testimony of petitioner were insufficiently reliable to meet *Schlup* standard).

But given the extent to which the conviction rests on M.A.'s testimony, we are not prepared to say that Arnold's claim cannot possibly meet the *Schlup* gateway standard (or whatever incrementally higher standard might govern a freestanding claim of actual innocence) when no factfinder has yet heard M.A. testify under oath on the matter of his recantation. M.A.'s recantation, if it represents the truth, would by itself exonerate

---

[6] The psychologist was of course not addressing the veracity of M.A.'s affidavit, which post-dated the trial. She had neither met M.A. nor evaluated the reliability of his account of the abuse his father inflicted upon him. That said, her testimony, and other expert opinion in a similar vein, would be quite relevant to an evaluation of the credibility and reliability of M.A.'s recantation and the strength of Arnold's claim of actual innocence.

Arnold as a factual matter. *See*, *e.g.*, *Lopez v. Trani*, 628 F.3d 1228, 1231 (10th Cir. 2010) (concluding for purposes of certificate of appealability that reasonable jurists might find claim of actual innocence, supported by affidavit of rape victim recanting trial testimony and averring sex was consensual, to be sufficient under *Schlup* to overcome time bar to late habeas petition); *Cain v. Oregon*, 546 F. App'x 641, 642 (9th Cir. 2013) (non-precedential decision) (finding victim's unequivocal recantation sufficient to satisfy *Schlup*).[7] To say that there is no

---

[7] Because Arnold's conviction rests substantively on M.A.'s testimony, this case may be contrasted with others in which the newly proffered evidence of innocence did not by itself exonerate the petitioner or there was additional evidence of the petitioner's guilt apart from the testimony supplied by a recanting witness. *See*, *e.g.*, *Davis*, 2018 WL 3913103, at *11–*15 & n.13 (recantation of murder eyewitness did not present credible gateway innocence claim where, *inter alia*, witness's original inculpatory statements were corroborated by other evidence, jury that convicted petitioner was aware that witness had not only made inconsistent statements but had previously recanted under oath and then rescinded recantation, and additional evidence presented at evidentiary hearing regarding innocence claim of petitioner's co-defendant had further corroborated witness's inculpatory version of events); *Gladney*, 799 F.3d at 899–900 (testimony of new witness insufficient to meet *Schlup* standard, as witness did not see fatal encounter between petitioner and victim and his testimony even if credited would not compel reasonable juror to conclude that petitioner had killed victim believing he was acting in self-defense); *Gandarela v. Johnson*, 286 F.3d 1080, 1086 (9th Cir. 2002) (rejecting need for hearing on petitioner's innocence claim where "[n]one of the proffered evidence involves a recantation by the victim or the other children who witnessed petitioner kissing her."); *United States v. Baker*, 824 F. Supp. 2d 918, 922 (D. N.D. 2011) (denying motion to withdraw guilty plea based on victim's recantation where defendant previously "had numerous opportunities to maintain his

(continued...)

point in proceeding to a hearing, given the rarity with which actual innocence pleas satisfy the *Schlup* gateway standard and the skepticism owed to recantations, would be to deem the innocence gateway closed to *any* petitioner whose conviction rests on the resolution of a credibility contest in favor of an accusing witness who has since disavowed his testimony.

Whether Arnold's claim of innocence meets the *Schlup* standard can only be determined after M.A.'s new account of events is subjected to adversarial testing under oath before a factfinder, so that the credibility and reliability of the recantation may be assessed. The Wisconsin courts themselves never passed on the credibility of M.A.'s recantation. *Cf. Mendiola*, 224 F.3d at 592–93 (state appellate court deemed witness's recantation to be highly incredible). Instead, the Wisconsin appellate court found it unnecessary to hear M.A. on the matter of his recantation, reasoning that it did not meet the state criteria for newly discovered evidence to the extent it was cumulative of evidence already before the jury. *Arnold*, 2015 WL 540534, at *2. As a result, no factfinder to date has witnessed M.A. testify on the assertions made in his affidavit and rendered a judgment as to whether M.A. is credible in his recantation of the testimony he gave at trial. Of course, the recantation itself is not the only evidence that must be considered in weighing the merits of Arnold's claim. *See Schlup*, 513 S. Ct. at 327–28, 115 S. Ct. at 867. But only after M.A. is heard and his credibility is evaluated can a court weigh the strength and reliability of the recantation against all of the evidence

---

[7] (...continued)
innocence, but instead admitted his guilt").

bearing on Arnold's guilt and determine whether Arnold has met the demanding *Schlup* standard.

The district court, like the state court, presumed that no such hearing was necessary, because the jury had heard defense witnesses recount M.A.'s alleged pre-trial, out-of-court statements denying that Arnold had sexually assaulted him. To that extent, the matter of M.A.'s inconsistent statements on the question of Arnold's guilt was already before the jury, and the jury, in convicting Arnold, obviously believed his trial testimony nonetheless. Thus, in the state court's view, M.A.'s post-trial recantation did not constitute new evidence for purposes of his request for a new trial. And based on that understanding of M.A.'s affidavit, the district court was convinced that "Arnold cannot prove that *no* reasonable juror would have convicted him [and therefore he] cannot satisfy the requirements for the actual innocence exception." R. 17 at 5 (emphasis in original).

Neither party has considered what weight, if any, we must give to the state appellate court's finding that M.A.'s recantation was cumulative. The court made that finding in resolving a question of state law (whether the recantation entitled Arnold to a new trial under section 974.06) rather than a federal constitutional claim.[8] The district court pointed out that the state court's analysis as to whether the affidavit constituted "newly discovered" evidence under Wisconsin law was "in line with" the *Schlup* requirements for the actual innocence

---

[8]  Wisconsin law does not currently recognize a claim of actual innocence based on newly discovered evidence. *See State v. McAlister*, 911 N.W.2d 77, 86 (Wis. 2018) (declining to reach issue).

exception to section 2244(d). R. 17 at 5. That is true in the sense that both inquiries focus on whether the newly-proffered evidence would meaningfully alter the nature of the evidentiary mosaic informing the jury's assessment of guilt. But given that the state court was not resolving a federal claim, we are not in the usual posture of considering whether the state court's analysis was contrary to, or constituted an unreasonable application of, Supreme Court constitutional precedents. *See* § 2254(d)(1). We are instead considering whether Arnold can show that he is entitled to the benefit of an equitable exception to the time bar set forth in a federal statute (section 2244(d))—a purely federal matter. *See McQuiggin*, 569 U.S. at 394, 133 S. Ct. at 1932; *Gladney*, 799 F.3d at 895–96. So it is not obvious that we should be bound by the state court's finding as to a separate question of state law. True, the state court's finding is partly factual, *see* § 2254(d)(2), although it does not amount to a finding of historical fact, *see Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1259 (11th Cir. 2012) (op. of Carnes, J.). If anything, it is a mixed finding of law and fact: factual to the extent that it describes and compares the content of the affidavit with the evidence already before the jury, and legal to the extent it embodies an understanding of the purposes for which the evidence—old and new—was and is offered and its relevance to the issues in the case. *See Mosley v. Atchison*, 689 F.3d 838, 848–49 (7th Cir. 2012); *Washington v. Smith*, 219 F.3d 620, 634 (7th Cir. 2000). In any case, the State has not argued for any degree of deference to the state court's characterization of the recantation as cumulative; and for the reasons that follow, we believe the state court was quite clearly wrong to characterize it as such.

The Wisconsin Court of Appeals' decision treated M.A.'s prior inconsistent statements regarding the sexual assaults as recantations, and in that sense viewed them as the equivalent of M.A.'s post-trial affidavit disavowing his trial testimony, but the inconsistent statements and the affidavit are two very different things. A recantation is generally understood to be the formal renunciation or withdrawal of one's prior statement or testimony. BLACK'S LAW DICTIONARY 1459 (10th ed. 2014). We may set aside the obvious point that any out-of-court statements that M.A. made prior to trial were not under oath and assume that one could treat the statements Behm and Augsburger attributed to M.A. as recantations of the report he had given to the authorities—*if* he acknowledged making those statements. But M.A. did not, in fact, acknowledge making those statements to Behm and Augsburger; he unequivocally denied having said to either Behm or Augsburger that nothing had happened between himself and his father. R. 31-2 at 267, 269, 275–76; R. 31-3 at 623–24. And the jury, of course, could well have chosen to credit M.A. on this point: Behm and Augsburger, after all, were both close to Arnold (Behm was Arnold's aunt and Augsburger was his good friend). Given the possibility that the jury could have believed the alleged recantations to be a fiction concocted by defense witnesses, it is inaccurate to say that M.A.'s "recantations" were already before the jury. M.A.'s post-trial affidavit, by contrast, indubitably is his own statement,[9] and that affidavit specifically disavows his own prior trial testimony. In no sense is that recantation cumulative of the evidence before the jury. The

---

[9]  There is no suggestion that the affidavit is not genuine.

recantation is, therefore, genuinely "new" evidence of Arnold's innocence that was not considered by the jury, which demands a fresh assessment of all of the evidence bearing on Arnold's guilt for purposes of determining whether he meets the *Schlup* standard.

The appropriate step, then, as the State recognizes, is for us to remand the case to the district court for an evidentiary hearing at which the credibility of M.A.'s recantation can be assessed along with the probable impact that the recantation would have had on reasonable jurors. As *Schlup* makes clear, any reliable evidence bearing on the veracity of the recantation and on Arnold's guilt or innocence may be considered in making these assessments.

Our decision to remand for a hearing should not be understood as reflecting any finding or impression on our part as to the reliability and credibility of the recantation. That is a question for the factfinder. We hold only that, taking M.A.'s affidavit at face value, Arnold has a plausible claim of actual innocence entitling him to an evidentiary hearing.

If, upon hearing and weighing the evidence, the district court concludes that no reasonable juror would have found Arnold guilty beyond reasonable doubt in view of M.A.'s recantation, then Arnold will be entitled to pursue his habeas petition notwithstanding its tardiness under section 2244(d)(1). At that point, it will be necessary to consider whether his freestanding claim of actual innocence presents a viable claim for relief in habeas and what standard of proof Arnold would have to meet in order to prevail on that claim. If, on the other hand, the court concludes that a reasonable juror could still

have convicted Arnold beyond a reasonable doubt notwith-standing M.A.'s recantation, then his petition must be dismissed as untimely.

### III.

The judgment of the district court is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.