NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0375n.06

No. 21-5577

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 15, 2023
DEBORAH S. HUNT, Clerk

JOHN LOWERY,

    Petitioner-Appellant,

v.

MIKE PARRIS, Warden,

    Respondent-Appellee.

)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF TENNESSEE

OPINION

Before: KETHLEDGE, STRANCH, and MATHIS, Circuit Judges.

KETHLEDGE, Circuit Judge. The State of Tennessee convicted John Lowery of murder and attempted murder on the basis of testimony from three eyewitnesses. A decade later, two of those witnesses recanted their trial testimony. Lowery sought a writ of coram nobis in state court, and both witnesses testified on his behalf. The court found the recantations unreliable and denied relief, and the Tennessee Court of Criminal Appeals affirmed. Lowery then filed this federal habeas petition. His petition came years after the close of the one-year statute of limitations, so the district court could consider it only if Lowery established that no reasonable juror would convict him today in light of the evidence as a whole. The district court held that Lowery did not meet this demanding standard, and we affirm.

I.

A.

In the early morning hours of October 8, 1996, John B. Lowery called the Knoxville police to report that three masked men had robbed him and stolen his car. Officer Gerald George

responded to the call and met Lowery at Lowery's uncle's house. There, Lowery told George that he could not identify the men, but that they had been armed with "various types of weapons" and had taken everything he had on him. George promptly created a police report detailing the incident.

Several hours later, at around 6:10 a.m., William Boatwright and his cousin Vincent Hartsell drove to Kirk's Market—a convenience store a few blocks away from where Lowery filed his police report—to buy drinks and snacks. When they got to Kirk's, they met up with their friend, Malik Hardin.

At around 6:30 a.m., an armed man arrived and shot Hartsell in the neck. Hardin had been in his car listening to music, and rushed to help Hartsell and tried to stop the bleeding. Meanwhile, Boatwright fled back into the store—but the gunman ran after him and shot him in the back. Boatwright survived the attack, but Hartsell died shortly afterwards.

In the hospital, Boatwright told Detective David Ridenour that "J.B." had shot him. Ridenour checked the police records for recent incidents involving those initials, and found Lowery's robbery report. That same evening, he showed Boatwright and Hardin a six-photo lineup which included Lowery—both identified Lowery as the shooter. Tennessee thereafter charged Lowery with Hartsell's murder and Boatwright's attempted murder. Lowery pled not guilty, and his case proceeded to trial in May 1998.

B.

At trial, Officer George testified to the robbery report made by Lowery. The prosecution then called William Boatwright, who explained that, on the morning of the shootings, he had been at Kirk's Market with Hartsell. He said that, while in the store:

> There was a guy that came in that kind of looked familiar. It was Mr. Lowery right there. And I looked at him, and I asked him what was he staring at. He didn't ever say nothing. He walked back out.

As Boatwright paid for their purchases, Hartsell went outside to wait by their car. Boatwright heard a shot, looked around, and saw "John Lowery runnin' towards" him, "holdin' a gun, a black gun." Boatwright continued:

> A: I tried to run back in the store after I heard a shot. Then [Lowery] shot me as I was goin' in the store.
> Q: Where did he shoot you?
> A: Right here in the chest.
> Q: Then what happened?
> A: Then I ran and crawled in the store and crawled around a counter, and he was about to come in the store. But the lady at the cash register, she was screamin'. So he took off . . . .

Boatwright said that after he had exited the store, he found Hartsell bleeding from his neck and tried to stop the bleeding. Eventually, though, he panicked and drove to his aunt's house, where he collapsed on the doorstep. Boatwright confirmed that he had picked Lowery from a photo-lineup that evening at the hospital.

On cross-examination, the defense asked Boatwright about the car he had used to drive to Kirk's:

> Q: Now, as I understood your testimony on direct examination, you said you were—had went there with the victim Hartsell? … In a—in a gray car that you got that was a rental car; is that correct?
> A: Yes.
> Q: Okay. Did you rent that car?
> A: No, sir.
> Q: Who rented it?
> A: I got it from a friend.
> Q: Pardon me?
> A: I got it from a friend.
> […]
> Q: Okay. How much did you rent it for?

A: Twenty dollars.
Q: That wasn't a stolen car?
A: I don't know.

Malik Hardin testified next. He said he had returned to his car after seeing Boatwright arguing with someone inside Kirk's Market. Then, he saw somebody fire a gun, turn around, and flee the scene. Hardin identified Lowery in the courtroom as the man he had seen.

The prosecution then called James Bowman. Bowman said he and his daughter had gone to Kirk's so that she could buy herself a drink for school. While his daughter was inside Kirk's, Lowery walked up to Bowman's car and told him that he had just been robbed. Then, Boatwright and Hartsell pulled up, and Lowery told Bowman "Don't look over there because that is one of the guys"—implying it had been Boatwright or Hartsell who robbed Lowery. But Bowman was a reluctant witness, and he kept interjecting "it's been so long" and "I don't know" before answering the prosecutor's questions. When asked to confirm that John Lowery had been at Kirk's, Bowman responded: "It could have been; it could have not been. There's another one out here that look just like him, his brother [Fred]."

A former girlfriend of Lowery's uncle Walter—Mary Santos—testified next. She said Walter had employed both John Lowery and Vincent Hartsell as drug dealers. According to Santos, Hartsell had stolen a shipment of drugs from Walter. When John Lowery found out, Santos said, Lowery promised that "I won't let him get away with this" and that "he would put a bullet right there." On cross-examination, Santos admitted she was locked in a bitter custody battle with Walter Lowery over their two young children.

In the defense's case, Walter Lowery testified that Santos was a liar and denied ever dealing drugs. The defense then called Fred Lowery, Jay Harris, and Greg Moore, who each testified that

they had been at Kirk's Market at the time of the shooting and that they had not seen John Lowery.

On cross-examination, however, all three denied having seen the actual shooter.

Lowery's neighbor, Tamara McMillan, was the defense's final witness. She testified that she had seen Lowery at 6:30 a.m. on the morning of the shootings. According to McMillan, Lowery had been scared and upset when he arrived at her house, because he had just been robbed:

> And I asked—I said, "Well, what's wrong, you know?" And he said, "I just got robbed." . . . And I said, "Well"—I said, "Are you all right"? He said, "Yeah." He said "I'm fine." He said, "But I'm scared to death." He said, "They took everything. They made me strip." He said, "I don't know if these people know where I live at or what."
>
> […]
>
> So he kind of sit (sic) there like he was about to cry. He was in tears. He was lookin' like—in a way that I had never seen him before.

In closing, the prosecution argued that Lowery shot Boatwright because of the robbery and Hartsell because he stole Walter Lowery's drugs. After 51 minutes' deliberation, the jury returned a guilty verdict. Lowery received a life sentence.

## C.

In September 2010, more than a decade after Lowery's conviction, Malik Hardin signed an affidavit in which he recanted his trial testimony and swore that he had not seen Lowery at Kirk's Market on the day of the shootings. A year later, the store clerk—Loretta Turner—came forward to say that she, too, had not seen Lowery that day, and that she had informed the police of that fact during her interviews after the shooting. Lowery thereafter filed a writ of error coram nobis in Tennessee state court, arguing that this newly discovered evidence entitled him to a new trial. The state court summarily dismissed Lowery's petition, but the Tennessee Court of Criminal Appeals reversed and remanded the case for an evidentiary hearing. *Lowery v. State*, 2013 WL

44767188 (Tenn. Crim. App., Sept. 4, 2014).  Shortly before that hearing, William Boatwright

submitted an affidavit also recanting his trial testimony.

The trial court held its evidentiary hearing in October 2014.  William Boatwright testified

first, contradicting the version of events to which he testified at trial:

> Q: Did you—were you inside or actually outside the store when you were shot?
> A: Outside.
> Q: Okay.  Did you see who shot Mr. Hartsell?  Hartsell, yes.
> A: No sir.
> Q: Did you see who shot you that morning?
> A: No, sir.

Boatwright then explained that police had pressured him to identify Lowery and threatened to

charge him with robbery and murder if he refused:

> Q: During that time, did you implicate John Lowery, also known as J.B., as the person who shot you that day?
> A: Yeah.  But it was only because they told—this was said to me, well, we know you committed an aggravated robbery, you know, so . . . I'm like, I didn't commit no robbery.  They're like, well, you committed the robbery, murder.  You did the murder.  I'm like, I didn't do no murder.  So they like, well, is this the person that did it?  So I—yeah, he the one that did it.  Just to keep them, you know what I'm saying, from, I guess, charging me for the murder charge.

Boatwright added that he came forward with his recantation because his false testimony had been

weighing on his conscience.

On cross-examination, the state asked Boatwright—who had been sentenced to 49 years'

imprisonment on an unrelated charge—about "the feeling towards snitches in prison."  Boatwright

responded:

> A: I don't know. I ain't never had no problem.  I don't bother nobody.  I don't know.  I don't know about that.
> Q: You don't know what the attitude is in prison towards snitches?
> A: No.
> Q: Never heard anything about that?

A: See, I done heard, but I heard people get stuff done to them or, you know, they don't talk to them or—I don't know, just different things.
Q: What kind of stuff gets done to them?
A: I don't know. They just say stuff get done to them. I don't know.

The state also elicited testimony that revealed Boatwright was serving his sentence in the same facility as Lowery.

Hardin testified next. He too said that police had threatened to charge him with robbery or murder if he did not identify Lowery as the perpetrator. But Hardin added that he had gotten "a good look at the shooter" and that the shooter "resembled Mr. Lowery," although he was now "100 percent certain that it wasn't Mr. Lowery." On cross-examination, Hardin admitted that Lowery had asked a jailhouse lawyer to draft Hardin's affidavit. Hardin said he had corrected several factual errors in the affidavit before submitting it to the court.

Turner testified last. She explained that, at the time of the shooting, she had been familiar with Lowery because he had dated her niece and attended a family cookout. Turner said that she had not seen Lowery at all on the morning of the shooting. But on cross-examination, she acknowledged that she had crouched behind a wooden counter for part of the incident, which would have blocked her view of the store.

The court again denied Lowery's motion, primarily because it found Boatwright and Hardin not credible. The Court of Criminal Appeals affirmed. *State v. Lowery*, 2017 WL 3078313 (Tenn. Crim. App., June 19, 2017). Lowery thereafter filed this *pro se* habeas petition in federal court, arguing (among other things) that his trial counsel had been ineffective, that the state suppressed Turner's testimony in violation of *Brady v. Maryland*, and that he was actually innocent.

The district court dismissed Lowery's petition as untimely, reasoning that because Lowery presented his affidavits in state court first, they did not constitute "new evidence" for purposes of the miscarriage-of-justice exception to the statute of limitations. This court reversed. *Lowery v. Parris*, 819 F. App'x 420 (6th Cir. 2020). On remand, the district court held that Lowery could not show that "no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Thus, the district court held, the statute of limitations barred Lowery's petition. This appeal followed.

## II.

We review de novo the district court's denial of Lowery's habeas petition. *Cleveland v. Bradshaw*, 693 F.3d 626, 631 (6th Cir. 2012).

## A.

A one-year statute of limitations governs federal habeas petitions. 28 U.S.C. § 2244(d)(1). Under the miscarriage-of-justice exception, however, federal courts may nonetheless consider the merits of an untimely petition if the petitioner can establish, by a preponderance of the evidence, that no reasonable juror would convict him in light of "all the evidence" now available. *House v. Bell*, 547 U.S. 518, 537 (2006) (cleaned up); *see also McQuiggin v. Perkins*, 569 U.S. 383, 401 (2013). The issue in this appeal is whether Lowery can satisfy that standard.

As an initial matter, the parties dispute the degree of deference we owe to the state court's factual determinations. The Supreme Court has explained that in "reviewing a federal habeas petition" we must "presume the state court findings correct unless we determine that the findings result in a decision which is unreasonable in light of the evidence presented." *Miller-El v. Cockrell*, 537 U.S. 322 (2013); *see* 28 U.S.C. § 2254(e)(1) ("a determination of a factual issue

made by a State court shall be presumed to be correct"). But the miscarriage-of-justice exception is a "gateway" antecedent to consideration of a habeas claim; it is not itself a habeas claim. *See McQuiggin*, 569 U.S. at 392. We have not yet decided the degree of deference appropriate in those circumstances and need not do so now. Appellate courts always owe significant deference to a trial judge's credibility determinations. *Miller-El*, 537 U.S. at 339-340. And credibility determinations are the only factual findings that matter here.

The state trial court determined that Boatwright and Hardin's initial testimony was more credible than their belated recantations. At the time that Boatwright gave his coram nobis testimony, he was anticipating another 44 years' confinement in the facility that also housed Lowery—an uncomfortable predicament for the star witness in Lowery's murder trial. A reasonable factfinder could take Boatwright's evasive answers to questions about the risks "snitches" face in prison as evidence that Boatwright had an ulterior motive to recant truthful testimony. *See McCroy v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007) ("Reasonable jurors no doubt could question the credibility of this about face from another inmate and rationally could discount his testimony as nothing more than an attempt to keep from being 'pegged as a rat' for having originally identified [petitioner] as the gunman"). Moreover, Boatwright's assertion that the police threatened to charge him with Hartsell's murder was implausible. Forensic evidence at trial showed that Hartsell and Boatwright had been shot in rapid succession by the same firearm. Boatwright—indisputably a victim of the shooting—would have been an unlikely suspect.

Hardin's testimony contained similar problems. Although the record does not clearly show whether Hardin and Lowery ever stayed in the same prison, Hardin agreed to testify only after another prisoner drafted an affidavit for him—at Lowery's request. And at the postconviction

hearing, Hardin confirmed that the shooter had looked a lot like Lowery.  Boatwright and Hardin both denied that Fred Lowery had committed the shooting, and there were no other suspects.  A reasonable factfinder could therefore choose to believe Hardin's trial testimony over his recantation.  Thus, the trial court's credibility determinations as to Hardin and Boatwright were reasonable.

That leaves the store clerk, Loretta Turner.  The Warden suggests that her testimony would have been cumulative because several of Lowery's friends testified that they had not seen him at the store on the day of the shooting.  But the testimony of an unbiased bystander plainly would have helped Lowery more than that of his friends, so that argument is meritless.  *See Stewart v. Wolfenbarger*, 468 F.3d 338, 357-58 (6th Cir. 2006); *Washington v. Smith*, 219 F.3d 620 (7th Cir 2000).  Still, Boatwright testified at trial that Lowery had reached into the store to shoot him without fully entering it; and Turner admitted at the postconviction hearing that she had crouched behind the wooden checkout counter during part of the shooting.  Thus, even combined with Hardin and Boatwright's testimony, Turner's testimony was not so damaging to the prosecution's case as to prevent any reasonable juror from voting to convict Lowery.  Lowery therefore cannot meet the demanding miscarriage-of-justice standard.  *McQuiggin*, 569 U.S. at 401.  His habeas petition is untimely.

## B.

Lowery argues in the alternative that the district court should have held an evidentiary hearing before dismissing his petition.  We review the district court's decision not to hold an evidentiary hearing for an abuse of discretion.  *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007).

According to Lowery, the district court should have held an evidentiary hearing because, when the state court held one, it was "resolving a question of state law"—not a federal constitutional claim. *See Arnold v. Dittmann*, 901 F.3d 830, 840-41 (7th Cir. 2018). But to prevail under the state-law standard, Lowery had to show that "the admissibility of the newly discovered evidence may have resulted in a different judgment had the evidence been admitted at the previous trial." *Freshwater v. State*, 160 S.W.3d 548, 553 (Tenn. Crim. App. 2004). That is a far more lenient standard than the federal one we apply here, but it goes to the same issue: the effect of the new evidence on a reasonable jury. The state trial court had already held an evidentiary hearing on that topic. And as explained above, its credibility determinations were reasonable. Thus, the district court did not abuse its discretion when it denied Lowery a new evidentiary hearing.

*        *        *

The district court's judgment is affirmed.