In the

# United States Court of Appeals
### For the Seventh Circuit

No. 21-1375

DARNELL DIXON,

*Petitioner-Appellant,*

*v.*

TARRY WILLIAMS,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1-17-cv-01142 — **Robert W. Gettleman**, *Judge.*

ARGUED OCTOBER 26, 2022 — DECIDED FEBRUARY 20, 2024

Before ROVNER, HAMILTON, and BRENNAN, *Circuit Judges.*

ROVNER, *Circuit Judge.* An Illinois state court jury convicted Darnell Dixon of home invasion and murder, for which he received a life sentence. Dixon sought post-conviction relief several times in the Illinois state courts before turning to the current federal habeas petition which focuses primarily on a claim of actual innocence and prosecutorial misconduct.

**I.**

Because Dixon did not contest the state court's factual findings, the district court adopted them, as will we. At Dixon's trial in a Cook County, Illinois court, Myron Gaston (Myron),[1] testified that he went to buy cocaine from James Allen (James) while his friends, Chris Jones and Jerome DeBerry, waited outside. After completing the transaction, the three men returned and robbed James and Marshan Allen (Marshan) of drugs and money. Dixon was present in the apartment during the robbery but testified that he was not robbed. James later called Myron's brother, Elroy Gaston (Elroy), to discuss the robbery, and over the next few days Myron met with James to return some of the stolen money, but none of the cocaine.

A few days later, on March 15, 1992, DeBerry, Elroy, and John Harris were at Myron's apartment when they received a phone call, but the caller said nothing. Myron left to run an errand and returned to find Harris hiding, and DeBerry and Elroy lying on the floor with fatal gunshot wounds.

Eventually the police identified the sixteen-year-old Marshan as a suspect in the murders of DeBerry and Elroy, and after hours of interrogation without his parents or a lawyer, Marshan confessed that he, Eugene Langston, and Dixon had robbed and killed DeBerry and Elroy.[2] Police arrested Dixon

---

[1] Several of the people involved in this case have the same last names and thus in those instances we use their first names for clarity and simplicity.

[2] Because there are so many people involved in this case, it may be helpful to categorize Dixon, Marshan, James, and Langston as the group of original robbery victims/later murder suspects, and Elroy, Myron,

(continued)

the next day. At the police station, Detective Michael McDermott and Assistant State's Attorney Henry Simmons interrogated Dixon. After six hours of interrogation, Simmons wrote a summary of the interview and brought it to Dixon to sign. Dixon initialed some changes that Simmons made to the written summary, such as correcting his name from Durrell to Darnell, but ultimately refused to sign it, claiming that it was false.

The state court denied Dixon's motion to exclude testimony about his confession, so at trial both McDermott and Simmons testified about the contents of that confession. Detective John Leahy, one of the arresting officers, also testified at trial that he advised Dixon of his *Miranda* rights upon arrest and was also present when Dixon's co-defendant, Marshan, confessed and implicated Dixon.[3] According to McDermott's testimony, after an officer read Dixon his *Miranda* rights, Dixon described how Myron failed to return the money and cocaine that he stole from James. Consequently, Dixon and Marshan stole a van, and the next morning Dixon and Langston used the van to drive to Myron's apartment. There, Langston fired into the door, kicked it in, and continued firing. Dixon also fired four to five rounds from a nine-millimeter handgun, and then the two returned to the van, which they subsequently abandoned a few blocks away from the crime scene before walking home. According to State's Attorney Simmons' testimony regarding the confession, Simmons read

---

Jones, DeBerry and Harris as the group of original robbery suspects/later robbery-murder victims.

[3] Another officer, James Boylan, testified that he repeated the *Miranda* warnings to Dixon at the police station.

Dixon his *Miranda* rights, offered food and use of the bathroom, and also offered Dixon the option of either having his statement reduced to writing by a court reporter or having Simmons write it up. According to Simmons, Dixon chose the latter. Simmons testified that when presented with the written statement, Dixon admitted that it was true, but nevertheless refused to sign it. Simmons' testimony about the substantive contents of the confession mirrored that of McDermott and the written statement itself. The state read the alleged confession into the record, and the court allowed the jurors to take the unsigned, written confession into the jury room and use it during deliberations.

Most of the state's case centered on that confession, but the state did present some corroborating evidence, albeit thin. That evidence included a report of a van closely matching the description of the one in the confession that had been stolen from the location where Dixon allegedly confessed to having stolen it. One witness reported seeing men fleeing in a brown van with a grey stripe. The stolen van was, in fact, grey with a maroon stripe. Police found the stolen grey van with the column stripped (indicating that it had been stolen), a few blocks from Dixon's apartment, near where Dixon described abandoning it in his alleged confession. The state never collected fingerprints from the van. Nor did investigators find any fingerprint matches for Dixon, Marshan, or Langston in the apartment where the murders took place. The state also called a witness from the telephone company who confirmed that the mystery phone call to Myron's apartment just shortly before the murders came from James' apartment—in other words, from the place where the original robbery that spurred the alleged vigilantism occurred.

During the trial, Dixon's lawyers sought to present evidence that Horace Chandler, who worked in the apartment building and was the only known neutral witness to the events of the day, had not identified Dixon in a lineup. Shortly after the crime, Chandler told the police that he saw a person leave the scene and enter a van. He was later called to identify the suspect in a lineup that included both Langston and Dixon, but, according to the police, he identified only Langston and not Dixon. Dixon's attorney would have liked to put Chandler on the stand to testify that he had not identified Dixon, but he was unable to locate Chandler by the time of the trial. Moreover, Chandler later swore in an affidavit signed before his lawyer that he had never identified anyone in the lineup.[4]

At trial, the court made clear that it would not accept hearsay evidence about Chandler's lineup identifications—or lack thereof—at trial. Despite that admonishment, Dixon's counsel nevertheless asked the detective present at the lineup, Detective David Friel, whether anyone witnessing the lineup had identified Dixon. After sustaining the state's objection, the trial judge gave Dixon's counsel two options to cure the error: Dixon's counsel could choose to strike all of Detective Friel's testimony or allow the state to question Detective Friel

---

[4] The parties refer to this as a recantation, although it is not a recantation in the literal sense. In general, we think of a recantation as a confession of error—that is, that someone later claims that she was incorrect about what she saw or heard. In this case, Chandler claims that he never identified anyone at the lineup—the implication of which is not that he erred or changed his mind, but rather that the government witnesses who said that he made an identification were either mistaken or not telling the truth. Despite this distinction, we use the term "recantation" at times for simplicity.

regarding whether Chandler identified anyone as the offender. The judge made clear that should counsel choose the latter option, he would not allow in evidence that Chandler later swore that he had never identified Langston. Dixon's counsel chose the latter option without objection to the options, thus allowing the jury to hear that Chandler had identified Langston as the person he saw at the crime, without any evidence of the recantation. Because the state's theory was that Langston and Dixon had committed the crime together, and that each accomplice was liable for the acts of the other, this evidence undoubtedly harmed Dixon's case.

Dixon testified in his own defense, stating that he had sold drugs for James in the past and was at his residence during the initial robbery, but that on the day James was robbed, he did not know about the drug sale and was not personally robbed. He testified that he knew nothing about the murders, did not receive a warning about his Miranda rights, and only initialed the alleged confession because Simmons ordered him to do so. He also testified that he refused to sign the confession because he knew nothing about the murders and did not commit them—a position he continues to hold to this day. Dixon's lawyer argued to the jury that McDermott had a motive to lie because the murders had gone unsolved for three weeks, and that Simmons was motivated by his desire to become a judge.

The jury found Dixon guilty of two counts of first-degree murder and one count of home invasion. The trial judge sentenced him to life in prison on June 24, 1994. Dixon appealed to the state appellate court, raising claims that are not relevant to this habeas petition. The appellate court affirmed the

decision on November 11, 1996, and Dixon did not appeal to
the Illinois Supreme Court.

Over three years later, on July 25, 2000, Dixon filed a pro
se post-conviction petition in the state court claiming, among
other things, that he was actually innocent and that both trial
and appellate counsel provided ineffective assistance of coun-
sel. The state trial court denied the petition reasoning that it
was both untimely and meritless. Dixon appealed the denial
of his petition for post-conviction relief, arguing that his trial
counsel had been ineffective first by opening the door for the
state to introduce evidence of Chandler's identification of
Langston, and later by failing to call Chandler to testify that
he never made an identification. The state responded that the
argument was untimely, forfeited, and meritless. The merits
portion of the state's argument included the following para-
graph:

> Moreover, Eugene Langston was not a co-
> defendant at the time of trial. Eugene
> Langston was never found guilty [in] con-
> nection to the crimes underlying defend-
> ant's conviction. Therefore, defendant's
> claim that he was prejudiced by a recanted
> identification of a man who had nothing to
> do with the murders is legally baseless and
> fully without any merit. While defendant's
> culpability may have rested on the theory
> of accountability to some extent, none of
> that accountability lies with Eugene Lang-
> ston.

R. 25-14 at 41.

This was an odd argument for the state to make because, as we noted, the state had molded its case on a theory of accomplice liability—that is, that Dixon could be held accountable for Langston's conduct. The state's brief also incorrectly stated that Dixon could not have been prejudiced by Friel's testimony because "[t]here was no testimony regarding any identification made by Horace Chandler." R. 25-14 at 41. This too was incorrect. The state put on testimony that Chandler viewed a lineup and identified Langston in that lineup. R. 25-26 at 518–519.

In his reply brief, Dixon pointed out the misstatements, but the state appellate court nevertheless affirmed, ruling that the petition for post-conviction relief lacked merit. In making that decision, the state appellate court explained that Chandler's identification of Langston probably had little effect on the outcome of the trial "as the prosecution never used that identification in argument, and Langston and other associates of the Allens could have committed the murders without Dixon's involvement. Placing Langston at the scene bore little relevance to the case against Dixon." R. 25-2 at 13–14. The Illinois Supreme Court denied Dixon's petition for review of that decision.

On June 27, 2011, Dixon filed a second petition for post-conviction relief in state court based, in part, on the fact that the state's latest filing acknowledged that Langston had nothing to do with the murders, thus eviscerating the state's argument about accomplice liability. The trial court denied the petition, the appellate court affirmed, and the Illinois Supreme Court denied the petition for leave to appeal.

Although it was not known at the time of the events of this case or the trial, it came to light later that Officer McDermott's

supervising officer, Commander Jon Burge of the Chicago Police Department, tortured countless suspects to elicit confessions in the decades between 1972 and 1991. Burge was eventually convicted in a federal court of obstruction of justice and perjury for his acts related to torturing suspects. *See United States v. Burge*, No. 08 CR 846, 2011 WL 13471, at *1 (N.D. Ill. Jan. 3, 2011), *aff'd,* 711 F.3d 803 (7th Cir. 2013). As for McDermott, the Illinois Torture Inquiry and Relief Commission documented fourteen abuse allegations against McDermott between 1984 and 1999, ranging from threatening and slapping suspects, squeezing their testicles, severely beating them, and, in one case, holding a gun to a suspect's head and threatening to kill him.[5] Several federal and state court judges have discussed McDermott's perjury. *See United States v. Burge*, No. 08 CR 846, 2014 WL 201833, at *2–3 (N.D. Ill. Jan. 17, 2014) ("McDermott has previously perjured himself and even gave testimony at the Burge trial that was inconsistent with his grand jury testimony."); *People v. Smith*, 596 N.E.2d 789, 792 (Ill. App. 1st 1992) (rejecting McDermott's testimony and finding that the arrestee was detained on pretext); *People v. Mitchell*, 972 N.E.2d 1153, 1159–60 (Ill. App. 1st 2012) ("A report of special prosecutors concerning an investigation into the crimes police committed at Area 2 specifically found sufficient evidence to prove beyond a reasonable doubt that McDermott, amongst others, participated in aggravated

---

[5] The Commission is authorized to gather evidence about claims of torture occurring in Cook County, and then determine whether there is sufficient credible evidence of torture to merit judicial review. 775 ILCS § 40/5.

battery of suspects and perjured himself about alleged confessions.").[6]

In February 2017, Dixon filed a pro se petition pursuant to 28 U.S.C. § 2254 for federal habeas corpus relief in the United States District Court for the Northern District of Illinois, the denial of which we now review. Dixon raised the two new pieces of evidence we described above—the state's brief stating that Langston had no involvement in the murders, and the evidence of McDermott's abuse of suspects and perjury. He raised the following three legal claims: (1) he was denied due process when the trial court excluded evidence that the state had dismissed charges against his alleged accomplice, Langston; (2) he received ineffective assistance of counsel when his trial lawyer failed to object to the exclusion of the evidence of Langston's dismissal; and (3) new evidence demonstrated that he was actually innocent. The district court agreed with the state's argument that Dixon's claims had been procedurally defaulted but held that Dixon had shown enough evidence of actual innocence to merit a further look. Thus, the

---

6 According to Dixon's brief, on November 4, 2016, Dixon filed yet another petition for post-conviction relief in state court based on new evidence regarding Officer McDermott's recently discovered history of perjuring himself and coercing confessions. According to Dixon's brief, he supplemented his petition in 2018 and again in 2021, and the motion is currently pending before the Circuit Court of Cook County. Dixon did not offer any citations for these filings, and we have not pored through the Illinois court's records to verify them. *See Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 510 (7th Cir. 2020) ("[I]t is not the role of the court to search the record to find support for a party's assertion.").

court ordered the state to respond to Dixon's petition on the merits.

After reviewing the parties' written submissions, in an August 2017 order, the district court held that Dixon presented new evidence sufficient to pass through the actual innocence gateway—which we explain below—to a merits review of his procedurally defaulted claims. *Dixon v. Watson*, No. 17 CV 1142, 2017 WL 3838027, at *5 (N.D. Ill. Aug. 31, 2017). Thereafter, to the three claims listed in the paragraph above, Dixon's newly appointed counsel added a fourth — that new evidence demonstrated that the state committed prosecutorial misconduct.

During the course of the proceedings in the district court, on November 20, 2018, Dixon moved the court to supplement the record on habeas review to include new evidence allegedly calling into question Simmons' credibility. In that motion, Dixon submitted a 2011 report published by the Chicago Council of Lawyers bar association that alleged that when Simmons ran for a position as a circuit judge in Cook County, he likely arranged for false candidates from his uncle's law firm to run against him to draw votes away from opponents, and thus swing the election.[7] Simmons denied the allegations. That evaluation also pointed to an opinion in which the Illinois Appellate Court found that a habeas petitioner had made "a substantial showing of a violation of a constitutional right," in part because Simmons had allowed a jailhouse informant

---

[7] The Chicago Council of Lawyers describes itself as "Chicago's public interest bar association." According to its website, since 1970, the Council has been evaluating judges and judicial candidates to provide information to the voting public.

to give false testimony against the petitioner. *See People v. Ramey*, No. 1-97-3817, slip op. at 9 (Ill. App. 1st, Feb. 22, 2000), attached as addendum to Appellant's Reply Brief at 9. According to the Illinois Appellate Court, "Although both Campbell [the testifying convicted felon] and Assistant State's Attorney Simmons testified that the state did not give Campbell a deal in exchange for his testimony against Ramey, Simmons' comment that he would inform [Campbell's sentencing] judge of Campbell's cooperation in the Ramey trial indicates otherwise." *Id.*

In a January 2019 order, the district court concluded that in the state court proceedings Dixon had a meaningful opportunity to present a complete defense, he was not denied due process, and his counsel was not deficient. Yet the district court's interest was still piqued by the actual innocence claim that had pushed Dixon through the gateway to this review. Regarding the claim of substantive actual innocence (which we will elaborate upon further below), the district court noted that the Supreme Court has never held that such a claim is cognizable absent a freestanding constitutional claim, but has surmised that if, in fact, the Court were to recognize such a claim, the new evidence would have to "'unquestionably establish' innocence." D. Ct. Op. at 15, R. 46 at 15 (*citing Schlup v. Delo*, 513 U.S. 298, 317 (1995)). The district court mused that had the jury known about McDermott and Simmons' histories, their credibility would have been "indelibly damned" and "[i]n light of their lack of credibility, the State's later disavowal of Langston's involvement, and the dearth of any physical evidence tying the petitioner to the crime, no reasonable juror would have found petitioner guilty beyond a reasonable doubt." D. Ct. Op. at 16, R. 46 at 16. Nevertheless, the district court concluded that the new evidence provided by

Dixon "does not, however, seem to meet the 'extraordinarily high' threshold of showing that petitioner is 'unquestionably' innocent." *Id.* at 17 (*citing House v. Bell*, 547 U.S. 518, 554–55 (2006)).[8] The district court's language that the new evidence did not "seem" to meet the threshold, reflected the court's discomfort with that new evidence—discomfort that was significant enough that the court wanted to determine whether an evidentiary hearing might alter its conclusion regarding actual innocence. Consequently, the court directed "the parties to submit supplemental briefs on what evidence, if any, would be produced at an evidentiary hearing that would entitle petitioner to relief on his substantive actual innocence claim." D. Ct. Op. at 17, R. 46 at 17. It is important to note that the judge did not order a hearing on substantive actual innocence, but rather ordered the parties to demonstrate in briefing what, if any, evidence they might submit at such a hearing.

On the prosecutorial misconduct claim, the court was disturbed by the contradictory positions the state took at trial and in post-conviction proceedings. At trial, the state secured Dixon's conviction by convincing the jury that he was accountable for Langston's acts. On post-conviction review, however, the state asserted that Langston had nothing to do with the murders and therefore exculpatory evidence about

---

[8] The word "unquestionably" as modifying "innocent" comes not from *Bell*, but from a key Supreme Court case on actual innocence, *Schlup*, 513 U.S. at 317 ("If there were no question about the fairness of the criminal trial, a *Herrera*–type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish Schlup's innocence.").

him would not have benefitted Dixon. Accordingly, the court also directed Dixon to present supplemental briefs describing what, if any, evidence he would produce in a hearing to demonstrate that he was entitled to relief on his prosecutorial misconduct claim.

After reviewing the written submissions on actual innocence and prosecutorial misconduct, the district court held from the bench that "on the actual innocence claim, the proposed witnesses that the petitioner would like to present, even if they were to be believed, would not meet the extremely high standard that would be required to conclusively exonerate him." R. 53 at 2. The court went on to explain that "[t]here is other evidence that would support a verdict in this case. It would basically be retrying the case. That's not the purpose of habeas. … So we're not going to have an evidentiary hearing on the actual innocence claim." *Id.*

As for the prosecutorial misconduct claim, the district court found the issue to be "disturbing," and concluded that Dixon should have a chance to take some discovery. *Id.* at 3–4. The court then held an evidentiary hearing, during which the appellate attorneys confessed that the statement in the state's brief that Langston's conduct was irrelevant was poorly written and inconsistent with the accountability theory of the case, which the state did not intend to abandon. At the end of the hearing, the district court concluded that "the prosecutors genuinely believed that Chandler had made a positive identification of Langston at the lineup despite his later recantation," and that Dixon failed to demonstrate that the testimony was false or that prosecutors knew Detective Friel's testimony was false. R. 127 at 4. As for the statement in the appellate brief that "Langston had nothing to do with the

crime," the court concluded that the statement had been made in error in a manner that amounted to "prosecutorial incompetence or even malpractice," but not the kind of prosecutorial misconduct that would call for the grant of a writ of habeas. *Id.* at 5–6. The district court concluded by granting a certificate of appealability.

## II.

### A. Actual innocence and prosecutorial misconduct

The only task for a federal court in reviewing a habeas petition from a state court conviction is to "ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Dixon centers his habeas petition on a claim of actual innocence. When courts speak of "actual innocence" claims on habeas review, they are referring to one of two kinds of actual innocence claims—"actual innocence" as a substantive matter, and "actual innocence" as a gateway claim through which a habeas petitioner might pass so that a court can consider constitutional claims that were otherwise procedurally barred. *Schlup*, 513 U.S. at 314–15. Dixon makes both claims here, but because the gateway claim of actual innocence is the one that unlocked the federal courthouse doors to Dixon's claim, we begin there.

A habeas petitioner may use a claim of actual innocence to overcome a procedurally defaulted and time-barred habeas claim, as a way to prevent a miscarriage of justice. *See* 28 U.S.C. § 2244(d)(1) (setting the period of limitation for application of a writ of habeas corpus); *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (describing actual innocence as a gateway through which a petitioner may pass to overcome a

procedural bar such as a statute of limitations). Allowing this gateway to a constitutional challenge balances concerns of finality and comity with the important "concern about the injustice that results from the conviction of an innocent person [which] has long been at the core of our criminal justice system." *Schlup*, 513 U.S. at 325.

The bar to proving such a claim, however, is onerous. The "standard is demanding and permits review only in the 'extraordinary' case." *House*, 547 U.S. at 538 (*quoting Schlup,* 513 U.S. at 327). *See also McQuiggin*, 569 U.S. at 386 ("tenable actual-innocence gateway pleas are rare"); *Arnold v. Dittmann*, 901 F.3d 830, 838 (7th Cir. 2018) ("No doubt the *Schlup* standard is an onerous one for the petitioner to meet"). The petitioner must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Schlup*, 513 U.S. at 327 (*citing Murray v. Carrier*, 477 U.S. 478, 496 (1986)). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id*. New evidence in this context is not "newly discovered evidence," but rather any evidence that was not presented at trial. *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016). "In evaluating the claim, the court is to conduct a comprehensive assessment that takes into account any reliable evidence probative of petitioner's innocence or guilt, even evidence that was previously excluded; the court is not bound by the rules of evidence that would govern at trial." *Arnold*, 901 F.3d at 837 (*citing Schlup*, 513 U.S. at 327–28).

To pass through the gateway, the petitioner must support the claim of actual innocence with "reliable evidence— whether it be exculpatory scientific evidence, trustworthy

eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. As this court described it, "[t]o demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005).

Even if a petitioner meets these high burdens, the heavy lifting has only begun. A procedural actual innocence claim is merely "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera,* 506 U.S. at 439. Once a petitioner satisfies the procedural actual innocence exception, he "must show that his conviction violates the Constitution, laws, or treaties of the United States" to obtain habeas relief. *Arnold*, 901 F.3d at 837.

The district court allowed Dixon to pass through the actual innocence gateway based on the new evidence Dixon presented on habeas review—the state's post-conviction contention that Langston's involvement was irrelevant to Dixon's case and evidence of McDermott's abusive and perjurious past. Despite significant doubts that Dixon could meet the high standard of proving that he was unquestionably innocent as a substantive matter, the district court allowed Dixon to submit supplemental briefs on "what evidence, if any, would be produced at an evidentiary hearing that would entitle petitioner to relief on his substantive actual innocence claim." R. 46 at 17.

Passage through that procedural gateway did not get Dixon far—not even to a hearing on substantive actual

innocence. The district court denied Dixon an evidentiary hearing on that claim, holding that "the proposed witnesses that the petitioner would like to present, even if they were to be believed, would not meet the extremely high standard that would be required to conclusively exonerate him." R. 53 at 2. That decision—not to hold an evidentiary hearing—is one we review for abuse of discretion only. *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007). We see no abuse of discretion here. Dixon's evidence of actual innocence fell far from meeting the substantial burden of establishing that no reasonable juror could have convicted him in light of the new evidence. *Schlup*, 513 U.S. at 327. Dixon simply had nothing close to the kind of reliable, conclusive, evidence that the case law demands. *See Schlup*, 513 U.S. at 324; *Hayes*, 403 F.3d at 938.

Of course, Dixon did have robust evidence that would give a jury good reason to doubt the credibility of McDermott's testimony. It goes without saying that McDermott's behavior warrants our most severe condemnation. Police officers who violate the rights of defendants by physically abusing them or by illegally coercing confessions in any manner not only harm the defendant but also, as this case demonstrates, risk degrading the strength of the government's case or having it dismissed outright. More importantly, those types of actions erode the public's trust and confidence in law enforcement and in our entire system of justice. For this reason, we would not want to conclude that the district court erred in allowing Dixon through the procedural actual innocence gateway. To the contrary, the district court properly paused to consider more thoroughly the implications of this kind of criminal behavior by police officers. We do not find it necessary to assess whether, after the pause, the district court should have allowed Dixon through the procedural actual

innocence gateway or not. That gateway itself, after all, does not allow for habeas relief. It merely allows a petitioner the opportunity to demonstrate some constitutional error in his trial. *Herrera*, 506 U.S. at 400. And because, after passing through that gateway, the court quickly dismissed his substantive actual innocence claim, even if we assumed the district court might have been too generous in allowing him through the actual innocence gateway (and we are not saying it was), that indulgence would have had no effect on the outcome of the habeas petition. The district court quickly concluded, even before allowing an evidentiary hearing on substantive actual innocence, that Dixon could not "meet the extremely high standard that would be required to conclusively exonerate him." R. 53 at 2.

The evidence that McDermott coerced confessions and perjured himself in other cases is simply not enough to surpass the high hurdle to show actual innocence given the facts of this case. To begin, Dixon has never alleged that McDermott coerced his confession, instead asserting that one of the arresting officers berated and screamed at him. But perhaps more importantly, a reasonable juror could have found Dixon guilty of the murder and robbery even knowing that McDermott coerced his confession and lied about it in court. *See, e.g. Gladney v. Pollard*, 799 F.3d 889, 900 (7th Cir. 2015) (noting that actual innocence cannot be found if a reasonable juror could accept any theory establishing guilt). It can, of course, simultaneously be true that McDermott was abusive and a liar **and** that Dixon committed the crime. Dixon has not presented the sort of evidence that could confidently demonstrate his innocence—no exonerating DNA evidence, record of incarceration at the time of the crime, video evidence of him in a

faraway location, or other evidence that could establish inno-cence conclusively. *See Schlup*, 513 U.S. at 324; *Hayes*, 403 F.3d at 938.

The state's evidence, thin as it was, was not dependent en-tirely on McDermott's testimony. The state set forth evidence of the stolen van that corroborated Dixon's confession, as well as the mystery call that came from James' apartment just be-fore the murders. Of course, the former also falls apart if the confession from which the information about the van came was fabricated by Simmons and McDermott, who may have been aware of the report of a stolen van in the area. But both Simmons' and McDermott's testimony about the confession lined up. Simmons' credibility, we now know, could have been challenged at trial with evidence that he was criticized by a bar association for his campaign tactics and also by—an Illinois Court of Appeals opinion for allowing an inmate to testify falsely. But the accusations against Simmons were far milder than those surrounding McDermott.[9] A jury could cer-tainly choose to believe Simmons' retelling of the confession.

---

[9] The state implies that Dixon's attack on Simmons lacks persuasive value because he "served with distinction as a state court judge and is now the managing partner of a prominent law firm. *See* Brief of Appellee at 17. Unfortunately, history has revealed that neither of those roles insulates a person from the temptation to engage in conduct unbecoming of the posi-tion. We acknowledge both the appellant's argument that Simmons was critiqued by a state appellate court and a reviewing bar association who rated him "not qualified" on three separate occasions before finding him qualified on a fourth (although we do not understand the significance of labeling the bar association as "alternative"), and also the appellee's argu-ment that Simmons' more recent professional activity has faced no criti-cism. Neither party's assessment of Simmons' credibility alters the out-come of this case.

And in any event, just as was the case with McDermott, the impeaching allegations against Simmons, even if believed, are not definitive evidence of Dixon's actual innocence.

Finally, in assessing actual innocence, a federal court also could have considered statements Marshan has made about the crime outside of Dixon's trial. *Schlup*, 513 U.S. at 327–28; *Arnold*, 901 F.3d at 837. In his own confession, Marshan told the police that he committed the crimes in a manner consistent with Dixon's confession. See *People v. Allen*, 2013 IL App (1st) 102884-U, ¶ 6, *as modified on denial of reh'g* (Nov. 13, 2013). Additionally, in a 2018 Chicago Tribune article, Marshan admitted that he, along with his "two co-defendants killed Elroy Gaston and Jerome DeBerry in a drug dispute." Marshan T. Allen, *Why Illinois Needs to Restore Parole for Juvenile Lifers*, Chi. Trib., Feb. 22, 2018.[10] Marshan has admitted his guilt in other interviews as well. *See* Rob Stafford and Lisa Capitanini, *Race in Chicago: One Man's Fight for Redemption*, NBC5 Chicago, Sept. 3, 2020. All of this would be fair game for a federal court to consider when evaluating a claim of actual innocence.

As for the existence of a substantive innocence claim, the Supreme Court has never held that such a claim, standing alone—separate and apart from any constitutional error— could support habeas relief; but neither has it held that such a claim cannot be considered. *See Herrera*, 506 U.S. at 404–05; *see also McQuiggin*, 569 U.S. at 392 ("We have not resolved whether a prisoner may be entitled to habeas relief based on

---

[10] https://www.chicagotribune.com/opinion/commentary/ct-perspec-parole-juvenile-lifers-prison-illinois-children-criminals-0222-story.html. https://perma.cc/PAL9-56SM

a freestanding claim of actual innocence."); *Dist. Att'y's Office for the Third Jud. Dist. v. Osborne*, 557 U.S. 52, 71 (2009) (noting that it is an open question as to whether there exists a federal right to be released upon proof of actual innocence.); *House*, 547 U.S. at 554–55 (declining to "answer the question left open in *Herrera*" about the existence of freestanding actual innocence claims). Nor has this court so held. *Cal*, 991 F.3d at 850–51; *Arnold*, 901 F.3d at 837 (explaining that we have never "indicated that an actual innocence claim could, standing alone, support the issuance of a writ in a non-capital case"); *Tabb v. Christianson*, 855 F.3d 757, 764 (7th Cir. 2017) ("Whether the constitutional guarantee of due process supports independent claims of actual innocence without any other constitutional violation remains open to debate."). As we recently pointed out in *Cal*, 991 F.3d at 851, many of our sister circuits have similarly grappled with the issue. *See id.* (compiling cases).

The Supreme Court in *Herrera* left open the possibility "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Herrera*, 506 U.S. at 417. This is not a capital case, but the Supreme Court has also noted that "it would be a rather strange jurisprudence, in these circumstances, which held that under our Constitution [a prisoner] could not be executed, but that he could spend the rest of his life in prison." *Id.* at 405.

Even Dixon concedes that if this circuit were to recognize a substantive actual innocence claim, the evidence of innocence would have to be highly reliable and "affirmatively

prove that [Dixon] is probably innocent." Appellant's Brief at 32 (*citing Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014)).

Unlike the threshold for a claim for procedural or gateway actual innocence, which we described above, the threshold for a substantive actual innocence claim is far less defined—perhaps because the right to such a claim is still very much up in the air. *See Arnold*, 901 F.3d at 837 n.4 *("It is also unsettled what particular standard of proof a petitioner would have to meet in order to be entitled to relief on a freestanding claim of innocence.")* All indications, however, point to a standard of proof for substantive actual innocence claims that is even more demanding than that for gateway actual innocence claims. *See Schlup*, 513 U.S. at 316 (noting that a petitioner trying to make a gateway claim of actual innocence need carry less of a burden than if claiming substantive actual innocence); *House*, 547 U.S. at 555 ("The sequence of the Court's decisions in *Herrera* and *Schlup*—first leaving unresolved the status of freestanding claims and then establishing the gateway standard—implies at the least that *Herrera* requires more convincing proof of innocence than *Schlup*."); *Arnold*, 901 F.3d at 838 ("The State presumes (not unreasonably) that the standard for granting habeas relief on such a [substantive actual innocence] claim would be even more demanding than the standard *Schlup* has established for innocence as a gateway to habeas review.")

Whatever the standard would be if the Supreme Court or this circuit decided to entertain claims of substantive actual innocence on habeas review, Dixon could not meet it. As we concluded in discussing even the lower standard of actual innocence as a gateway claim, Dixon lacks anything close to the kind of definitive or convincing evidence that the Supreme

Court and this court require. *Hayes*, 403 F.3d at 938 (describing "documentary, biological (DNA), or other powerful evidence" such as "credit card slips, photographs, and phone logs.").

We also reject Dixon's alternative request to remand for an evidentiary hearing on the issue of actual substantive innocence. We review the district court's denial of further evidentiary hearings for an abuse of discretion and we see none here. *Coleman v. Hardy*, 628 F.3d 314, 318 (7th Cir. 2010). The district court gave Dixon more than the benefit of the doubt by allowing him to pass through a very demanding procedural gateway to a merits review. The court then carefully considered the arguments Dixon made about the state's appellate brief, the new evidence about McDermott and Simmons, and even allowed an evidentiary hearing on prosecutorial misconduct. The district court concluded that even if Dixon were to present the evidence he described in his filings, and the witnesses were believed, the evidence would not meet the extremely high standard required for a showing of actual innocence. We see no abuse of discretion.

## B. Constitutional claims

Dixon's final claims are ones he had hoped to make after passing through the procedural actual innocence gateway. We have declined to conclude one way or another about the propriety of opening that gateway, but we will swiftly resolve these claims in any event.

Dixon argues that the state trial court violated his rights under the Confrontation Clause by admitting hearsay and then prohibiting Dixon from responding. As we described earlier, the court had issued an order excluding testimony

regarding the lineup and specifically about the witness, Chandler's, out-of-court statements regarding the lineup identifications. Nevertheless, Dixon's counsel asked Detective Friel whether he had shown Chandler a lineup that included Dixon. And he asked Simmons whether any detectives had told him that "Dixon had been in a lineup that day and was not identified?" R. 25-26 at 393. In response to the violation of the court's order, the court gave Dixon the choice of striking Friel's testimony or allowing the state to question Friel about whether Chandler identified anyone in the lineup. The court stated that it would not, however, allow hearsay testimony of Chandler's recantation.

Dixon concedes that he did not raise this claim in the district court. An argument not raised in the district court is forfeited on appeal. *Frazier v. Varga*, 843 F.3d 258, 262 (7th Cir. 2016). We are not convinced that there are any extraordinary considerations that would warrant overlooking the forfeiture. For the same reason, Dixon has forfeited the claim that his trial counsel was ineffective by opening the door to Detective Friel's testimony in the first place.

Finally, Dixon alleges that the court erred when making credibility findings about the prosecutors' beliefs regarding the lineup identification. Dixon argued below that the prosecutors committed misconduct because they knew that Chandler did not identify Langston during the lineup, and yet they elicited testimony from Detective Friel to the contrary. This argument assumes that Chandler was telling the truth when he declared, over a year after the lineup, that he had never identified anyone in the lineup. After an evidentiary hearing on prosecutorial misconduct, including testimony from the prosecutors about why they were skeptical of the late

recantation, the court found that the prosecutors "genuinely believed that Chandler made a positive identification of Langston at the lineup despite his later recantation." R. 127 at 4. The court continued, "I find that the petitioner had failed to demonstrate that that testimony was false or that the prosecution knew that it was false." *Id.* This was a factual finding made by the district court after a full hearing and review of post-hearing briefs, transcripts, notes, prior opinions, and Dixon's entire file. We review such factual determinations for clear error only, giving special deference to factual findings regarding credibility. *United States v. Sanford*, 35 F.4th 595, 599 (7th Cir. 2022). The court's hearing fully aired the evidence as to whether the prosecutors believed that Chandler positively identified Langston. The court also thoroughly vetted the state's claim that it simply erred when it stated in its brief that Langston's actions were irrelevant to the crime. The court described the event as "prosecutorial incompetence, or even malpractice," but not the type of error that would allow for a grant of habeas. R. 127 at 247.We see no clear error in the district court's factual findings on the prosecutorial misconduct and the related credibility determinations.

The decision of the district court is AFFIRMED.