In the

# United States Court of Appeals
## for the Seventh Circuit

No. 20-2700

RICKY PATTERSON,

*Petitioner-Appellant,*

*v.*

FELICIA ADKINS, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 19-CV-2198 — **Colin S. Bruce**, *Judge.*

ARGUED MAY 17, 2022 — DECIDED JANUARY 2, 2025

Before SYKES, *Chief Judge*, and KIRSCH and JACKSON-AKIWUMI, *Circuit Judges*.

SYKES, *Chief Judge*. In 2003 an Illinois jury convicted Ricky Patterson of first-degree murder, arson, and felony concealment of a homicide in connection with the 2002 death of Derrick Prout. The crimes were set in motion when Patterson arranged to buy 30 pounds of marijuana from Prout in Champaign, Illinois. Prout went missing immediately after they met to complete the transaction.

The evidence against Patterson, though largely circumstantial, was characterized as "overwhelming" by the Illinois Supreme Court. *People v. Patterson*, 841 N.E.2d 889, 912 (Ill. 2005) ("*Patterson I*"). The prosecution established that Patterson killed Prout while the two were at Patterson's rented home in Champaign. He wrapped the body in a blanket, put it in the trunk of Prout's car, then tried to clean the victim's blood off his living-room carpet. When that failed, he set fire to his house in an attempt to destroy the evidence. Patterson then drove Prout's car to a remote area northwest of Chicago and left it in a field surrounded by trees, inaccessible except by an unmarked dirt road. Two days later Patterson (or perhaps an accomplice) returned and set the car on fire. Prout's charred body, wrapped in the blanket from Patterson's home, was found in the trunk of the burned car. DNA testing confirmed that the blood on the carpet in Patterson's home was Prout's.

For these crimes Patterson was sentenced to 55 years in prison. The state supreme court affirmed the judgment. *Id.* at 912–13. Patterson then filed a petition for state postconviction relief together with a motion for additional DNA testing. Protracted proceedings in state court followed. In July 2019—more than 13 years after the Illinois Supreme Court affirmed the convictions on direct appeal—Patterson sought federal habeas review under 28 U.S.C. § 2254. The one-year limitation period had long-since expired even accounting for tolling during the pendency of Patterson's state postconviction petition. *See* 28 U.S.C. § 2244(d)(1)(A), (d)(2). To overcome the time bar, Patterson invoked the exception for claims of actual innocence. The district court rejected his claim and dismissed the § 2254 petition as untimely.

We affirm. Patterson's § 2254 petition was more than six years late even with tolling for a properly filed state postconviction petition. And we agree with the district judge that Patterson's claim of actual innocence falls far short of the necessary showing to qualify for this narrow gateway to merits review of an untimely § 2254 petition.

## I. Background

Our account of Patterson's case comes from the record of his five-day trial and the additional proceedings in the Illinois trial, appellate, and supreme courts. The case has a labyrinthian factual and procedural history; we will simplify where possible.

In June 2002 Ricky Patterson was living with his girlfriend Migdalia Rivera and their daughter in a rented house on the periphery of Champaign, Illinois. The house bordered acres of farmland and there were few neighbors. The couple shared a single cellphone that was registered to Rivera, but Patterson usually carried it; there was no landline phone in the home. At the time of the crimes, they were experiencing financial problems. They had not paid their rent for four months and were being evicted. On or about June 12, Patterson told the landlord that they would pay the $3,600 they owed in back rent and move out on June 22.

Derrick Prout, the murder victim, lived in Indianapolis with his wife Christa. He had lost his job and was selling drugs to supplement his unemployment benefits. Patterson was one of his customers. Phone records show that on June 16, Patterson called Prout, and the two exchanged additional calls that day while Prout was driving back to Indianapolis from Chicago. Patterson arranged to buy a large quantity of

marijuana from Prout in Champaign the next day. Prout's wife Christa later told police that Prout had already left their Indianapolis home for Champaign by the time she woke up on the morning of June 17.

Prout had a girlfriend in Champaign named Candice Johnson, and he visited her on the afternoon of June 17 after arriving in town. But first he met with Patterson to finalize the terms of their planned drug transaction. They met at a shop in Champaign owned by Patterson's brother, and Patterson arranged to buy 30 pounds of marijuana from Prout for $16,000 later that evening. This was odd: a man who was $3,600 behind in rent was unlikely to have $16,000 to pay for a large distribution quantity of drugs.

After the two men agreed on the terms of their transaction, Prout went to his girlfriend Candice's apartment, arriving at about 4 p.m. He brought a duffel bag full of marijuana and hid it in her pantry. Candice later testified that she and Prout went to dinner, returned to her apartment, and watched television until about 8 p.m. when Patterson arrived in his Chevrolet Blazer. Prout went outside and spoke with Patterson. He then returned to the apartment, retrieved the duffel bag full of marijuana, told Candice that he would be back later, and left in his maroon Dodge Intrepid. Patterson followed in his Blazer.

That was the last time anyone other than Patterson saw Prout alive. Cellphone records show calls between Prout and Patterson around 8:30 p.m. via a cell tower near Patterson's home on the edge of town. When Prout did not return later that evening as promised, Candice repeatedly tried to reach him, but he did not pick up her calls. She also tried calling Patterson to find out where Prout was, but he did not answer

either. Christa Prout's calls to her husband likewise went un-answered.

When Christa still could not reach her husband the next day, June 18, she called Chrystal Peacock, one of Prout's sisters who lived in Champaign, and told her that Prout was missing. Chrystal called Candice and asked when she had last seen Prout. Candice told her what had happened the night before and gave her Patterson's phone number. Peacock then called Patterson asking about her brother. Patterson told her he met Prout at a carwash the previous evening to do a drug deal. He said that Prout left after they completed the transaction, but he stayed behind and washed his truck. Monique Adams, another of Prout's sisters, called Patterson at about 8 p.m. on June 18 also looking for information about her missing brother. Patterson told her a different story than the one he gave Chrystal: he said he met Prout at a carwash where they were "supposed to" do a drug deal but "did not." Patterson then hung up on Monique.

In the overnight hours of the next day—to be precise, at about 3:20 a.m. on June 19—a police officer reported that Patterson's house was on fire. While the officer waited for the fire department to respond, he observed that the windows and doors were closed and intact. When firefighters arrived, they confirmed that all doors to the home were locked. White supremacist graffiti was spray painted inside and outside the house. This too was odd. Patterson and his girlfriend were unlikely targets for this sort of crime; they had no problems with neighbors or acquaintances, and neither of them had received any race-based threats or intimidation.

Once the fire was suppressed, local sheriff's deputies and an investigator from the Illinois State Fire Marshal's Office

began investigating the cause of the fire. Parts of the ceiling and walls of the home had fallen, and the floor was covered with rubble. In the living room investigators discovered a can of spray paint and two plastic gasoline containers; the containers still smelled like gasoline. The investigator from the State Fire Marshal's Office determined that the fire was intentionally set.

On June 19 Monique Adams called Patterson again, this time to arrange for family members to talk with him about what happened to Prout. Patterson agreed to meet with them at 6 p.m. but did not show up. When she called him at 6:45 p.m. to find out where he was, he told her he had just learned that his house had burned down and would contact her later.

At about 7:30 p.m., Patterson and his girlfriend went to their burned house and talked with police officers who were there. When asked about his whereabouts during the overnight hours when the fire was set, Patterson told the officers that he left Champaign for Chicago around 8 p.m. that night—June 18—and returned on the afternoon of June 19 after someone called and told him that his house had burned down. His cellphone records contradicted this story. The records showed that calls were made on his phone via a cell tower in Champaign on the evening of June 18 until about 9:30 p.m. and again between 7 and 9 a.m. on June 19. Indeed, Patterson's phone did not leave the Champaign area until 1:30 p.m. on June 19. Call records showed that the phone traveled north along I-57, reached Chicago at around 4:45 p.m., then immediately turned around and returned to Champaign.

Patterson told the officers that he planned to return to Chicago the next day, June 20, and agreed to meet with them when he got back to Champaign. The officers proposed a

meeting time of 3 p.m. on June 20. Patterson agreed. The appointed time came and went, but he did not show up.

Phone records showed that Patterson's phone left Champaign on the morning of June 20 heading toward Chicago. It continued traveling north *past* Chicago to the border of Cook and Lake Counties northwest of the city. At 4:06 p.m., the phone placed a call via a cell tower near I-53 and Lake Cook Road in the Village of Long Grove in Lake County, northwest of Chicago.

On June 21 investigators returned to Patterson's home looking for evidence of Prout's disappearance. They walked through the burned house and searched drawers and closets. To avoid disturbing the evidence, however, they did not look under the debris on the floor. Other than the locked doors and graffiti, they found nothing suspicious. That same day—June 21—Patterson and his girlfriend checked into a Holiday Inn in St. Louis.

A little after 9 a.m. on June 22, Thomas Lucich—a Long Grove resident who lived on the outskirts of the village in a heavily wooded area—heard four or five "thuds" coming from outside his home and off to the east. He looked outside in the direction of the noise. Through a small gap along a tree line, he saw a car on fire. He called 911.

The burning car was in an isolated spot, accessible only by an unmarked, dead-end dirt road and surrounded by trees. Importantly, it was near the border of Cook and Lake Counties and the intersection of I-53 and Lake Cook Road, the same vicinity as the call from Patterson's phone at 4:06 p.m. on June 20. Firefighters responded to Lucich's 911 call and approached the burning car. It was a Dodge Intrepid, engulfed

in flames. The car had sustained heavy damage by the time the fire was suppressed, but the license plate confirmed that it was registered to Prout. His charred body was found in the trunk, wrapped in a blanket with a distinctive pattern of geometric shapes. A Long Grove fire lieutenant who responded to the fire testified at trial that a burning car makes popping and cracking noises as hoses and tires and other parts explode, which explained the thuds that Lucich heard.

Later that day, at the instruction of Lake County authorities, St. Louis police arrested Patterson and his girlfriend Migdalia Rivera at the Holiday Inn. The next day, June 23, St. Louis police detectives interviewed Patterson. He told them that he did not own a cellphone and refused to provide Rivera's telephone number. When asked about his whereabouts at the time of the fire at his home, he repeated his story that he had traveled to Chicago the night before. At the end of the interview, Patterson and Rivera were released and free to go.

On June 24 investigators returned to Patterson's burned home in Champaign to continue what was now a murder investigation. This time they searched under the rubble on the floor. Under a thick pile of debris in the living room, they found a mound of clothing. Only the top of the pile was burned, and under the clothing there was a small area rug and a soapy sponge. Under the rug was a large bloodstain. There was also a strong scent of Pine Sol cleaner, and it looked as if someone had tried to clean up the blood. In the kitchen, investigators found empty bottles of bleach and Pine Sol, a bucket, and a roll of undeveloped film. They confiscated these and other items of physical evidence, sent the bloodstain for DNA testing, and developed the film.

The photographs from the film included several photos showing Patterson, Rivera, and their daughter wrapped in a blanket with a distinctive geometric pattern—the same as the blanket that was wrapped around Prout's body in the trunk of his burned car. DNA testing of the blood found on the carpet of the burned home yielded only a partial profile because the evidentiary sample was degraded; two of the 13 tested loci were unavailable. But the partial profile matched Prout's DNA: the probability of the same partial profile appearing in someone else in the general population ranged from 1 in 16.3 quadrillion to 1 in 51.9 quadrillion.

An autopsy of Prout's body revealed that he had been stabbed eight times in the head and neck, including fatal stab wounds to his neck that cut his windpipe and arteries. He had also been shot twice in the head and neck. A Lake County forensic pathologist found that Prout died of "multiple stab wounds with multiple gunshot wounds contributing to his death." Based on her observation of Prout's body, the pathologist determined that Prout had been dead for some time when the car fire was set, but the exact time of death was not ascertainable.

On September 10, 2002, Patterson was arrested for the murder of Derrick Prout. He was charged with first-degree murder, arson, and concealment of homicidal death. The case proceeded to trial in April 2003. The prosecution's case included the evidence we've just outlined and more. Our account above suffices for present purposes, but one additional point is worth mentioning. Prosecutors called Patterson's girlfriend Migdalia Rivera as a witness, but she invoked her Fifth Amendment right against self-incrimination. So the judge

permitted the prosecution to introduce her grand-jury testimony.

Patterson testified in his own defense. He told the jury that on the evening of June 17, he and Prout left Candice Johnson's apartment building in Champaign and drove in their own vehicles to a nearby carwash where he gave Prout $16,000 in exchange for the duffel bag of marijuana. He said Prout left the carwash in his Dodge Intrepid immediately after the exchange while he stayed behind and washed his Blazer. He said he then returned home and went to bed around 10:30 p.m.

Patterson testified that on the following evening, June 18, he drove to Chicago for a court appearance on the morning of June 19, leaving their home in Champaign with Migdalia and their daughter at around 8 p.m. He said they went first to the Chicago suburb of Schaumburg, northwest of the city, where he sold eight pounds of marijuana to a man named Chris Smith, then stopped for the night at a motel in Palatine, also a northwest suburb of Chicago. He testified that his car would not start the next morning, so he missed his June 19 court date in Chicago; he said it was rescheduled for June 20. Although his new court date was the very next day, Patterson told the jury that he drove back to Champaign with his family on the afternoon of June 19. He said that while they were on the road that afternoon, he received a call from his brother who told him about the fire at his house. He further testified that on the morning of June 20, he returned to Chicago and attended his rescheduled court hearing at 9 a.m. Finally, he said that on June 21 he and his family drove to St. Louis and checked into a Holiday Inn, arriving at around 10:15 or 10:30 p.m.

Patterson's testimony conflicted with cellphone records, which as we've noted provided compelling evidence of his location during the relevant timeframe. When cross-examined by the prosecutor about the whereabouts of his phone on June 18 and 19, Patterson claimed that he accidentally left the phone in a friend's car in Champaign at 3:30 p.m. on June 18. When pressed for the friend's name, he said it was Chris Smith—the same Chris Smith to whom he sold marijuana in Schaumburg that evening. When asked why he didn't complete the sale when the two met in Champaign that afternoon, he said Smith did not have the money, so they arranged to do the deal that evening in Schaumburg. And when asked why he didn't retrieve his phone from Smith when they completed the drug deal in Schaumburg in the evening, he said "it didn't really cross my mind." Patterson testified that he retrieved his phone from Smith on the morning of June 19, after he had car trouble and missed his court date.

These claims too were contradicted by the phone records, which showed that calls were placed on his phone from Champaign on the morning of June 19—first to the Chicago courthouse where he was scheduled to appear but did not, and then to his mother. Indeed, as we've explained, the phone records established that his phone did not leave Champaign until early afternoon on June 19 and then returned that same evening. They also showed that on June 20, his phone traveled north on the route to Chicago but only made it as far as Kankakee and Bourbonnais—about 60 miles southwest of Chicago—at the time he claimed to be in court for his rescheduled appearance. And a call was placed from his phone via a cell tower near 1-53 and Lake Cook Road in Long Grove at 4:06 p.m. that day. Patterson admitted on cross-examination that he had his phone with him that day.

The case was submitted to the jury with instructions on criminal liability as a principal and under an accountability theory based on evidence that Patterson may have had an accomplice for all or part of this criminal course of conduct. The jury found Patterson guilty on all counts. The judge sentenced him to 50 years in prison for the murder and 5 years each for arson and concealment convictions, with the murder and arson sentences to run consecutively, for a total of 55 years in prison.

The Illinois Supreme Court affirmed the judgment on direct review on December 15, 2005. *Patterson I*, 841 N.E.2d at 913. The court held that the admission of Rivera's grand jury testimony violated Patterson's Sixth Amendment right of confrontation but found the error harmless because the evidence against him was "overwhelming." *Id.* at 906. The court rejected all other challenges, including claims of ineffective assistance of counsel, prosecutorial misconduct, and a challenge to the sufficiency of the evidence. *Id.* at 906–913. Patterson did not file a petition for certiorari in the Supreme Court, so the judgment became final on March 15, 2006, when the time to do so expired.

On June 15, 2006, Patterson filed a petition for state post-conviction relief and a motion for new DNA testing under § 116–3 of the Illinois Code of Criminal Procedure. *See* 725 ILL. COMP. STAT. 5/116-3. His postconviction petition raised claims of ineffective assistance of counsel; his § 116–3 motion claimed that additional DNA testing would prove his innocence. The trial judge denied both requests. On July 11, 2012, the Illinois Appellate Court affirmed the decision denying Patterson's postconviction petition but remanded for further proceedings on his § 116–3 motion. *People v. Patterson*, 971

N.E.2d 1204, 1210–11 (Ill. App. Ct. 2012) ("*Patterson II*"). Patterson did not seek further review of the adverse decision on his postconviction petition in the Illinois Supreme Court.

After lengthy remand proceedings on the § 116–3 motion, the state agreed to submit the blood evidence for a new DNA test using a 15-loci test protocol. The new test produced a full profile that again matched Prout's DNA. Patterson's expert reviewed the test report and confirmed that the profile was clear and complete. The trial judge then denied the § 116–3 motion as moot and also denied Patterson's request for independent DNA testing. Patterson appealed, and the Illinois Appellate Court affirmed. On September 26, 2018, the Illinois Supreme Court denied Patterson's petition for leave to appeal ("PLA").

Four months later, on January 25, 2019, Patterson sought permission from the state supreme court to file a late PLA from the appellate court's July 2012 decision affirming the denial of his postconviction petition. The clerk's office sent Patterson a notice stating that it had "timely filed … [his] motion … for leave to file a late petition for leave to appeal," which would be "presented to the court for consideration." On March 19, 2019, the Illinois Supreme Court denied his motion to file a late PLA.

We come at last to these habeas proceedings. On July 24, 2019, Patterson petitioned for habeas review under 28 U.S.C. § 2254 raising 12 separate constitutional claims. The district judge dismissed the petition as untimely under § 2244(d), which provides that a § 2254 petition must be filed within one year after the challenged state-court judgment becomes final, subject to tolling during the pendency of a properly filed application for state postconviction relief. Patterson invoked the

exception for claims of actual innocence, but the judge held that he failed to make the necessary showing to qualify for the exception. The judge also denied Patterson's request for a certificate of appealability. Patterson renewed that request in this court, and we permitted this appeal.

## II. Discussion

A state prisoner seeking federal habeas review of his conviction or sentence under § 2254 must do so within one year of the date the judgment becomes final. § 2244(d)(1)(A). The limitations period is tolled for the "time during which a properly filed application for [s]tate post-conviction or other collateral review … is pending." *Id*. § 2244(d)(2). The district judge dismissed Patterson's § 2254 petition as untimely. We review that decision de novo. *Arnold v. Richardson*, 14 F.4th 780, 784 (7th Cir. 2021).

The Illinois Supreme Court affirmed Patterson's convictions and sentence on December 15, 2005; the judgment became final on March 15, 2006, when the time to file a petition for certiorari in the Supreme Court expired. *Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009). More than 13 years elapsed between that date and his § 2254 petition on July 24, 2019. Patterson's petition is therefore untimely unless the limitation period was tolled for all but one year of that intervening period.

The limitation clock ran for 91 days from the date the judgment became final to June 15, 2006, when Patterson filed his state postconviction petition and § 116–3 motion for additional DNA testing. Time was tolled from that date until July 11, 2012, when the Illinois Appellate Court affirmed the denial of the postconviction petition. Though the appellate court

remanded for further proceedings on the § 116–3 motion, Patterson could have sought further review of the adverse decision on his postconviction petition in the state supreme court. But he did not file a PLA in the Illinois Supreme Court. So as of that date—July 11, 2012—the petition for state postconviction relief was no longer pending and the limitation clock restarted. *See Fernandez v. Sternes*, 227 F.3d 977, 979 (7th Cir. 2000). Counting from that date and including the 91 days that elapsed before Patterson filed his postconviction petition, the limitation period expired on April 12, 2013—more than six years before he filed his § 2254 petition.

Patterson argues that the limitation period was tolled during the remand proceedings on his § 116–3 motion and remained tolled until September 26, 2018, when the Illinois Supreme Court denied his PLA seeking review of the appellate court's decision affirming the denial of that motion. He also maintains that the limitation clock stopped again on January 25, 2019, when he filed his motion in the state supreme court seeking permission to file a late PLA from the appellate court's July 2012 decision affirming the denial of his postconviction petition. He argues that because the clerk's office accepted his motion as "timely filed," the limitation period was further tolled from January 25 until March 19, 2019, when the state supreme court denied the motion to file a late PLA. On this chain of reasoning, the limitation clock was still running when he filed his § 2254 petition on July 24, 2019.

Patterson's tolling theory suffers from several flaws. First, "a motion under § 116–3 is not a collateral review of the underlying judgment and therefore does not toll the statute of limitations for bringing a federal habeas corpus petition under 28 U.S.C. § 2254." *Price v. Pierce*, 617 F.3d 947, 952 (7th Cir.

2010). Nor was the time tolled while Patterson's motion for leave to file a late PLA was pending. We've held that if the Illinois Supreme Court *grants* a motion to file a late PLA, the limitation period is tolled from the date of the motion through the court's decision on the merits. *Fernandez*, 227 F.3d at 979. But that did not happen here. The Illinois Supreme Court *denied* Patterson's motion, so his motion to file a late PLA had no effect on the running of the limitation clock. *Id.* Patterson's § 2254 petition was more than six years too late.

Though untimely, Patterson argues that we should review the merits of his § 2254 petition under the exception to the time bar for claims of actual innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). To pass through the "actual innocence" gateway to merits review of a time-barred § 2254 petition, a state prisoner "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536–37 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Applying this standard, we consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (internal quotation marks omitted). Based on the entire record, we "make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id.* (quoting *Schlup*, 513 U.S. at 329). Patterson can succeed under this standard only if he produces "reliable evidence … that was not presented at trial." *Schlup*, 513 U.S. at 324. And "[t]he bar to proving [an actual-innocence] claim … is onerous." *Dixon v. Williams*, 93 F.4th 394, 403 (7th Cir. 2024). The standard "is demanding and permits review

only in the 'extraordinary' case." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327).

Patterson's evidence falls far short of satisfying this standard. He points first to a medical report showing that on June 16, 2002, he was treated in the emergency room for lower back strain and prescribed narcotic pain medication. He contends that the ER report proves that he was physically incapable of committing these crimes. Not so. The ER report has limited weight, if any at all. Standing alone, it does not establish that Patterson was physically incapable of fatally stabbing and shooting Prout. Indeed, Patterson's trial attorney testified during state postconviction proceedings that he ruled out a medical defense after consulting the treating physician who told him that Patterson could have committed the crimes with the back condition and pain medication described in the report. Finally, Patterson's case was submitted to the jury with instructions on principal liability as well as an accountability theory based on evidence suggesting that Patterson might have had an accomplice.

Patterson next argues that other drug dealers had a motive to kill Prout over unpaid debts. This claim is based on information from Prout's wife Christa, his girlfriend Candice Johnson, and other family members who reported that Prout had been threatened by other drug dealers several months before the crimes. Vague, unsubstantiated reports of threats hardly qualify as reliable evidence that someone else likely committed the murder. Even if we grant that the evidence of threats *might* suggest that someone else *might* have had a motive to kill Prout months before the murder, it does not advance Patterson's claim of actual innocence. Without more, any theory of an alternative suspect is speculative.

Patterson also suggests that someone saw Prout's car after their drug transaction at the carwash—namely, a witness named Kim Taylor, who said she thought she saw Prout's car at an intersection in Champaign late in the evening on June 17. As the district judge noted, however, Taylor's statement was equivocal. She said she saw a car that she believed was Prout's, but when she approached it, she saw another person driving and concluded that it must belong to someone else.

Finally, Patterson points to information from Sally and Robert Kruger, who lived in Long Grove near the spot where Prout's car was set on fire. They reported hearing two gunshots shortly before they saw the fire. For starters, this argument is seriously underdeveloped. It was presented only in Patterson's pro se habeas petition; there is no statement from the Krugers, either sworn or otherwise. Moreover, a report of two gunshot-like sounds is consistent with Thomas Lucich's trial testimony that he heard several loud thuds before he saw the car fire. And the Long Grove fire lieutenant testified that burning cars make popping and cracking sounds as hoses and tires and other parts explode.

In short, Patterson's "new evidence" is meager and in some respects not new at all. And when considered against the powerful case the prosecution presented at trial, it does not come close to establishing a probability that no reasonable juror would have found him guilty. The circumstantial evidence of Patterson's guilt—the physical evidence, cellphone records, witness testimony, and DNA evidence—was overwhelming. Although the initial DNA test produced only a partial profile, the match between Prout's DNA and the blood on the carpet was statistically irrefutable. And the match was

later confirmed by more sophisticated DNA testing during the § 116–3 proceedings.

Accordingly, we agree with the district judge that Patterson has not satisfied the demanding actual-innocence standard to obtain merits review of his untimely § 2254 petition. The petition was properly dismissed.

AFFIRMED